THE STATE OF OHIO, APPELLEE, *v.* STATEN, APPELLANT.

---

(No. 83-CA-32—Decided
March 28, 1984.)

*Mr. James R. Livingston,* prosecuting attorney, and *Mr. Charles H. Sell,* for appellee.

*Swinehart & Princi Co., L.P.A.,* and *Mr. Howard E. Swinehart,* for appellant.

BROGAN, P.J. George Snyder is the proprietor of S & S Concessions. His business includes operating the concession stands at the Hobart Arena located in Troy, Ohio. On Sunday, November 14, 1982, at approximately 10:40 p.m., Snyder was the victim of a robbery that took place in the parking lot of the arena. Following a hockey game earlier that evening Snyder was exiting the building with his brother, his wife, and his sister. He had in his possession the receipts from the evening's concessions. As he was nearing his car, Snyder was approached by a man who appeared to be carrying a gun and demanded that Snyder hand over his money. Snyder handed over the concession proceeds which were in excess of $1200. The money was primarily made up of small bills and change and was contained in cloth night deposit bags provided by First National Bank. Snyder was then ordered to hand over his car keys. The robber then sped away in Snyder's car. The car was later found abandoned near the arena.

Based upon information obtained by the Troy Police Department from Judy Godfrey, the ex-wife of Gene K. Staten, defendant-appellant herein, four suspects were arrested. The four suspects included Richard Free, Staten, Austin (Buck) Burkhardt, and the brother of the victim, David Snyder. Burkhardt was identified as the one responsible for the actual commission of the robbery, while the remaining suspects were implicated for their participation prior to and after the robbery itself. Free was alleged to have been the driver of a getaway vehicle. Dave Snyder admitted his involvement by providing information as to the time and place that the robbery should occur. Staten was allegedly involved in the solicitation and planning of the crime. Staten's involvement is also alleged to arise in his participation in the concealment and division of the money following the robbery. Staten was subsequently indicted on the charge of aggravated robbery.

Prior to trial no Crim. R. 16 demand for discovery was made by the defendant. The prosecutor did however voluntarily deliver to defense counsel a list of witnesses that included Godfrey and an unnamed informant. Also included in the discovery was "money recovered in robbery-approximately $200.00." It was later discovered at trial that Godfrey was also the confidential informant for the Troy Police Department. This fact was not disclosed prior to trial.

During the course of the trial Godfrey testified that shortly after the robbery she was over at the defendant's residence with the defendant and Free. Among other things she stated Staten had given her $50 in what she recalled to be large denominations. Detective Jack Gheen of the Troy Police Department testified that Godfrey had delivered to

him forty-eight one dollar bills claiming she received the money from Staten. In his opening and closing remarks the prosecutor relied upon the fact so many one dollar bills were involved. He also represented to the jury that he did not know why Godfrey was not sure of the denominations.

It was later discovered after the trial that what in fact happened was that the defendant did in fact give Godfrey $50 in larger denominations. She in turn exchanged this money, for whatever reason, with Free who was present at the defendant's residence at the time Godfrey received the money from her ex-husband. This fact was known to the prosecutor before trial but was never disclosed to the defense counsel.

Staten was subsequently acquitted of aggravated robbery but was found guilty of the lesser included offense of robbery. Following his conviction the defendant moved for a new trial for various reasons including the state's failure to disclose both Godfrey's identity as an informant as well as its failure to reveal the exchange of funds between Godfrey and Free. Defendant requested a new trial on the following grounds:

(1) Irregularities in the proceeding which prevented defendant from having a fair trial;

(2) misconduct of (a) the jury, (b) the prosecuting attorney, and (c) witnesses for the state; and

(3) the verdict is not sustained by sufficient evidence and is contrary to law.

Appellant's motion for a new trial was overruled. The trial court stated in its order the following:

"There was little doubt that Judy Godfrey was a police informant. Neither the prosecutor nor defense counsel asked Godfrey about the source of the 48 one dollar bills. Although there might have been an impression in the minds of the jurors that Godfrey received the one dollar bills from Staten, this impression was not prejudicial to Staten. Rather, it created an inconsistency in the testimony which defense counsel took full advantage of during final argument. The source of the 48 one dollar bills would not have been discoverable under Criminal Rule 16. There was no prejudice to Staten from the admission in evidence of the 48 one dollar bills and no prosecutorial misconduct.

"The final ground alleged for granting a new trial is that the verdict is against the weight of the evidence. The Court, having heard the evidence, finds that the verdict of the jury is supported by proof beyond a reasonable doubt as to each element of the offense for which Staten was convicted."

The appellant timely filed his notice of appeal and requests his conviction be overturned on two separate grounds. Staten maintains in his first assignment of error that:

"Appellant was denied a fair trial guaranteed to him under the Fourteenth Amendment of the United States Constitution due to misconduct by the prosecutor and witnesses for the state."

Initially we point out that the record fails to reveal any witness misconduct at trial. Although the testimony of Godfrey and Gheen are contradictory in regard to the denominations of the bills she received from the appellant, there is nothing to indicate either witness was lying. Each witness relayed to the court what they knew. Godfrey was never directly questioned on whether the bills she handed over to Gheen were the same ones she obtained from Staten. There is no indication she purposely withheld the facts of the intervening transaction with Free as she was never asked about it. Nor is there any indication that Gheen testified to anything other than the truth as he knew it, to wit: that Godfrey got the $48 from Staten. We therefore find no merit to this branch of appellant's first assignment of error as stated above.

In regard to the attorney misconduct appellant has alleged three potentially improper actions and/or inactions which may have arguably constituted prohibited behavior on behalf of the state. The appellant claims the prosecutor's actions constituted misconduct in that: (1) the state failed to disclose the fact that Godfrey and the informant were one and the same, resulting in a deception on the defendant that hampered his investigation in that it misled the defense into believing another witness existed and did not allow for a thorough cross-examination of the witness; (2) the state failed to disclose exculpatory evidence to the defendant; to wit, the intermittent exchange of funds; and (3) the prosecutor, in his closing argument exploited the false testimony of his witnesses which he knew to be not wholly truthful, thereby failing to correct this error in the evidence as presented to the jury.

We find no merit to appellant's assertion that the state's failure to disclose the fact that Godfrey was also a police informant constituted prosecutorial misconduct. We fail to see how defendant's investigation was hindered, particularly in the absence of a demand by the defendant for the disclosure of the informant's identity. Godfrey also honestly testified on direct exam that she was indeed a police informant. Neither she nor the prosecutor attempted to hide this fact from the jury. The defendant was given adequate opportunity to cross-examine the witness in order to attempt to discredit her testimony in light of her status of an informant. There being no apparent prejudice from the record we cannot conclude the prosecutor acted improperly in this regard.

The mere fact that the prosecutor failed to disclose before trial the intervening exchange of funds between Godfrey and Free in and of itself is not considered by this court to warrant a finding of attorney misconduct. Having failed to make a Crim. R. 16 demand for discovery the prosecutor's obligation to disclose information is substantially diminished. His obligation is not however totally relieved. In *United States* v. *Agurs* (1976), 427 U.S. 97, 107, the Supreme Court established that where there has been no request at all for disclosure the prosecutor still has an obligation to disclose evidence it possesses which is "obviously exculpatory." We are not of the opinion that this evidence alone obviously exculpates the appellant as the explanation could possibly be as damning as was the absence of this evidence at trial.

We are however troubled by the prosecutor's conduct at trial in failing to disclose the concealed transaction in light of the testimony elicited therein, and his subsequent reliance on the misleading testimony in his closing argument. This conduct is particularly egregious where as in the present matter the state's own witness provides testimony which could mislead the jury into believing that the forty-eight one dollar bills were obtained by Godfrey from the appellant, while the prosecutor idly sat by knowing full well that the witness' testimony did not accurately reflect the actual facts. To then rely on this mistaken impression not only in his closing remarks but in his opening statement in order to draw a favorable inference that implicates the appellant's involvement in the robbery constitutes in the opinion of this court improper conduct on behalf of the state. While the "heat of the battle" may tend to excuse some remarks in closing argument, no such excuse exists at the time of opening statement.

The state put on as their witnesses both Godfrey and Gheen. Godfrey testified that at approximately 12:30 a.m. on Monday, November 15, 1982, she met with Staten and Free at the E&J Bar in Troy, Ohio. She stated the three of them

left together and proceeded to the appellant's residence where she observed the other two handling money. She stated further that both Staten and Free had money on them but was unsure as to the amount. She also testified that she saw a bag that she thought had First National Bank written on it. She could not recall whether the money she saw was removed from the bag. She did however recall that Free had a bundle of singles on him. At that time Staten handed over to her $50 in what she believed were larger bills.

Gheen testified on direct that he met with Godfrey at which time she handed over forty-eight one dollar bills. He also stated that she did explain where she received the bills. He did not however elaborate on her explanation as the prosecutor did not so inquire. The forty-eight bills were then admitted into evidence. On cross-examination the detective stated that Godfrey had told him she received the money from Staten.

We believe the prosecutor had a duty at this point to clear up the misunderstanding as he was privy to knowledge that the testimony of Gheen was both incorrect and misleading. Gheen did not testify falsely as he was conveying what he knew to be the facts. This does not however excuse the prosecutor from disclosing what he knew to be the truth so as to avoid misleading the jury.

We find it particularly offensive to the notion of the fair administration of justice when, not only does misleading evidence knowingly get submitted to the jury, but, this evidence is actually used by the state in its opening and closing remarks to the jury. The transcript reveals the prosecutor made the following remarks in his opening statement:

"And the evidence will show that he took in on various nights anywhere from $1,000.00, $1,500.00, $2,000.00, mostly in cash. A lot of it was in change; a lot of it was dollar bills; and some of it higher denominations.* * * The evidence will show that later in the week, Mr. Staten was seen with a good deal of money —dollar bills mostly.* * *"

In his closing statement the following remarks were made:

"What did the police discover after that robbery? They talked with Judy Godfrey. She indicated and turned over to them some money she indicated was given her at Gene Staten's house. And she's indicated and she's testified that she saw money being taken out of a bag, she doesn't remember the color, she thought it was a dark bag, taken out of a bag that had First National written on it. And at that time money exchanged hands. Rick Free had some money. She thought that was mostly in ones. She thought she got primarily larger bills. But the money she turned over to Jack Gheen, who was the detective in this case, that same morning, was $50.00, fifty one dollar bills — fifty one dollar * * *. Where would somebody get fifty one dollar bills? I would suggest to you that her testimony is credible because a robbery just happened earlier that night, a lot of one dollar bills were taken — she saw a lot of one dollar bills given to Rick Free. *I don't know why she — whether she made a mistake or what the reason she did not recall the exact denomination she was given by Gene Staten.* But in fact she turned over the money to Jack Gheen that morning — forty-eight one dollar bills." (Emphasis added.)

The import of this part of his argument is to show that the appellant was in possession of a large number of small bills shortly after a robbery where other testimony revealed that the money stolen was made up primarily of smaller denominations. The prosecution obviously sought to impress upon the jury an inference that the funds given to Godfrey were proceeds from the robbery. Not only did the prosecutor rely upon the incomplete evidence, he went so far as to expressly misrepresent to the jury

that he did not know why Godfrey could not recall the exact denominations she received from Gene Staten. He stated that she was perhaps mistaken, but that she in fact turned over forty-eight one dollar bills to Gheen. Such statements were false as he did know that her testimony was not mistaken. The prosecutor in effect used an inconsistency in the evidence to mislead the jury.

For the reasons just mentioned we are of the opinion that the actions of the state attorney constituted prosecutorial misconduct. Our remaining inquiry under this assignment of error is to determine whether this misconduct resulted in an unfair trial in violation of the appellant's Sixth Amendment rights.

The United States Supreme Court recognized in *Mooney* v. *Holohan* (1935), 294 U.S. 103, that the prosecutor, as an agent of the state, has a constitutional duty to assure the defendant a fair trial. Consistent with this notion is the obligation of the prosecutor: (1) to refrain from knowingly using perjured testimony, see *Mooney, supra;* (2) to disclose certain evidence favorable to the accused, see *Brady* v. *Maryland* (1963), 373 U.S. 83; *United States* v. *Agurs, supra;* and (3) to correct testimony he knows to be false, see *Napue* v. *Illinois* (1959), 360 U.S. 264. The theme underlying these obligations is to assure a fair trial by avoiding the use of false and/or incorrect testimony which might mislead the jury in their deliberations. In the present matter, although no knowing use of perjured testimony appears from the record, we find the conduct of the prosecutor similarly offensive. Initially the prosecutor failed to correct the testimony of Gheen when he knew that it was both incorrect and misleading. Although Gheen's testimony may not have been false as he knew it, it certainly failed to convey the actual facts as the prosecutor knew them. The misleading effect upon the jury is no less diminished by the fact the witness did not know he was testifying falsely. We believe the prosecutor had an obligation at this point of the proceedings to correct that testimony. To then make use of this testimony, albeit not necessarily perjured, when the true facts were known to the prosecutor for the specific purpose of strengthening the state's case by impressing upon the jurors an inference favorable to the state is as offensive as using perjured testimony to the same end. The ultimate effect is to mislead the jury. When such occurs the defendant's right to a fair trial is seriously jeopardized.

In *Agurs, supra,* the Supreme Court stated at 103 that:

"* * * [A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." (Citing *Giglio* v. *United States* [1972], 405 U.S. 150, 154; and *Napue* v. *Illinois* [1959], 360 U.S. 264, 271.)

See *Wagster* v. *Overberg* (C.A.6, 1977), 560 F. 2d 735 (habeas action involving Ohio prosecution where the court followed *Agurs*). Having decided there is no practical distinction between the use of perjured testimony and what occurred in the present matter we feel compelled to follow this standard.

In evaluating whether the nondisclosure was material to the jury's finding of guilt, we must evaluate it in the context of the entire record. *Agurs, supra,* at 112. If upon review of the record we cannot conclude that there is no reasonable likelihood that the undisclosed matter could have affected the verdict, then we must reverse. Our review does reveal substantial evidence that the appellant was involved in the concealment and division of the proceeds of the theft. We cannot however conclude that the state's misconduct in

this matter did not affect the judgment of the jury.

The testimony of Dave Snyder implicates Staten in the planning of the robbery. Snyder's testimony also indicates Staten was the person who solicited him for information surrounding the robbery. In fact Snyder testified that Staten threatened to harm him and/or his family if he did not cooperate. Snyder also claimed a meeting took place at the E&J Bar where he, Staten, Free and Burkhardt were present in order to plan the crime. Bea White, a barmaid at the E&J, corroborated Snyder's testimony that four men including Staten were at the same table in the bar several days prior to the robbery. She did not hear any of the conversation. She did testify however that after the men departed Staten said to her, "If everything comes off right, I'll set the place up tomorrow." White also stated that Staten came into the E&J about a week after the robbery to exchange twelve dollars worth of nickels. But, she also admitted on cross that it wasn't unusual for Gene to come in with large amounts of change which he had won playing poker.

Godfrey also testified she was made aware by the defendant as to when a robbery was to occur. She was not made aware of where. Gheen testified she had given him this information prior to the commission of the crime. Godfrey also stated she was present at Staten's residence following the robbery, at which time she was given $50. Her testimony also revealed that it was not unusual for Staten to give her money for the support of their child.

The police also found a First National Bank deposit bag as well as money wrappers stamped with S&S concessions in Staten's trash after the robbery. This discovery resulted from a tip from Godfrey. At trial George Snyder identified the bag as one stolen from him on the evening of November 14. There was also testimony from Dave Snyder that he received his cut of the robbery directly from the appellant.

This evidence certainly indicates Staten may have been involved in receiving, concealing and disposing of the robbery proceeds. However, the credibility of both Dave Snyder and Godfrey were placed in issue at trial. Apparently Godfrey had in the past sought to prevent having Staten released on parole for a prior crime. It also was revealed that Staten had at one time slit the tires of Snyder's vehicle. Obviously such actions could result in a certain amount of animosity between the two.

We cannot conclude the evidence presented against Staten was overwhelming. Nor can we conclude that the misconduct by the state in failing to correct the testimony of Gheen did not affect the jury verdict. Particularly where the record reveals the prosecutor compounded his failure to disclose by seizing upon the inaccuracies in order to infer the money in evidence was the same as that which Godfrey received from appellant. Such evidence is obviously damaging to the defendant's case and may well have affected the jury's decision. When in doubt as to the prejudicial effect of such misconduct we must find in favor of the defendant in order to preserve the accused's presumption of innocence.

The prosecution in a case must always keep in mind his duty to see that justice be done. As such, his role is more than mere advocate for the state, rather he has an obligation to proceed fairly to assure the innocent are not punished. This duty has been eloquently stated by the United States Supreme Court in the following terms:

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a

criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger* v. *United States* (1935), 295 U.S. 78, 88.

This duty is equally applicable to the prosecutors for the various states in the Union. When a prosecutor acts contrary to this obligation in order to procure convictions by his misconduct the integrity of the judicial system itself is tarnished. Consequently such conduct cannot be tolerated.

We would also point out that in this case we are not limited in our review to whether or not the trial judge abused his discretion in denying a new trial. See *Agurs, supra,* at 111. This is unlike the typical motion for a new trial that is sought in light of newly discovered evidence. The appellant's error challenged on appeal goes to the issue of whether his due process right to a fair trial was violated. The appropriate standard of review therefore is to determine, as we have, whether the prosecutor's misconduct may have been so egregious so as to deny Gene Staten the fundamental right to a fair trial. There may well be sufficient evidence to support the conviction absent the state's misconduct. This fact does not relieve this court from its obligation to protect the rights of the defendant as provided for in the United States Constitution. We would be remiss in our duties if we were to allow such conduct at trial when it may have sufficiently affected the jury so as to influence its decision.

For the above-mentioned reasons we hereby find appellant's first assignment of error well-taken. The case shall be remanded for a new trial.

Appellant's remaining assignment of error challenges the sufficiency of the evidence. He maintains that:

"The jury verdict of guilty of robbery was against the manifest weight of the evidence and [not] supported by proof beyond a reasonable doubt."

This assignment of error was raised in the appellant's motion for a new trial. The trial judge overruled the motion on this ground. Upon review of the record we are of the opinion the trial court did not abuse its discretion in so ruling. There was substantial credible evidence to support the jury's verdict beyond a reasonable doubt. We therefore may not substitute our judgment for that of the jury where such evidence exists. See *State* v. *DeHass* (1967), 10 Ohio St. 2d 230 [39 O.O.2d 366]. The trial court did not abuse its discretion in overruling the motion for a new trial on these grounds.

Appellant's second assignment of error is overruled.

The judgment of the trial court is reversed and this cause is remanded for a new trial.

*Judgment reversed and cause remanded.*

KERNS and WEBER, JJ., concur.