JOURNAL ENTRY and OPINION.
{¶ 1} Defendant-appellant Eugene Barrow appeals his convictions for aggravated robbery, aggravated burglary, and kidnapping. We affirm.
 {¶ 2} Barrow and co-defendant, Lavelle Moore, were indicted for aggravated burglary, aggravated robbery, kidnapping, and felonious assault, each including firearm specifications.[1] The following evidence was presented at their jury trial:
 {¶ 3} The victim, Olivia Penn, testified that on March 23, 2001 she was nine months pregnant and living in a duplex on Paxton Avenue with her boyfriend, Rashee McLaurin. On that day, Dallas King and Tonja Snyder came to her apartment to inquire about renting the upstairs unit. McLaurin was out of town. Penn showed King and Snyder her apartment, which had the same layout as the upstairs apartment. About a half hour after King and Snyder left, they returned and told Penn that they had lost their keys. They looked around her apartment for the keys and King used the phone to call AAA. While King was on the phone, Snyder used the bathroom.
 {¶ 4} Penn testified that when she went back to the front room, she saw two men with their mouths covered by masks. One of the men, later identified as Moore, told her, "Lay it down. Lay it down," while pointing a gloved hand at her head like a gun. She spun around and saw that King had a real gun pointed at her head. She immediately laid down while a man she later identified as Barrow hog-tied her by duct-taping her hands and feet together. He also placed duct tape around her eyes and nose. When she told him she could not breathe, he removed the tape from her nose.
 {¶ 5} According to Penn, after she was restrained, the men asked her, "Where's the money? Where's the money? Where's Rashee?" The men ransacked the home and took jewelry, money from a safe, and part of a gun. She heard one of the men say, "Come on Tonja."
 {¶ 6} After they left, Penn was able to escape from the duct tape. She then called her landlord and 911. Penn gave birth five days later.
 {¶ 7} Officer Martina Latessa testified the police processed the scene for fingerprints. According to Penn, King and Snyder were not wearing gloves and she had given them each a beverage in a glass. The other men were wearing gloves. Tonja Snyder's fingerprints were recovered from one of the glasses. A notebook was also found containing the names of Tonja Snyder, Dallas King, and "Heavy," aka Moore. It also contained a sketch of the man that Penn identified as the man who came to look at the apartment, Dallas King. He was wearing the same dog-chain necklace in the sketch that he wore during the robbery.
 {¶ 8} According to Officer Latessa, the police were still processing the scene when Rashee McLaurin returned home. He went to the bedroom, where he picked up a box and looked in it. He was told to put down the box because it was not processed yet. He complied and, when the police looked inside, they found 270 grams of cocaine and a large amount of marijuana. McLaurin and Penn were charged with possession of drugs. McLaurin pled guilty to the charge, and the charge against Penn was dismissed.
 {¶ 9} Officer Rehor testified that three days after the robbery, he made a traffic stop of a car in which Snyder and King were riding. He recognized King's name as a suspect in the robbery and arrested him and Snyder.
 {¶ 10} Approximately one month after being arrested, King approached the police and told them that he, Snyder, "Heavy," aka Lavelle Moore, and Eugene Barrow, were involved in the robbery. They were all arrested.
 {¶ 11} On August 1, 2001, Penn identified Moore in a photo array as one of the men who robbed her, and she later identified him in a line-up.
 {¶ 12} After McLaurin pled, he was also shown a photo array and recognized Barrow as a cousin of his friend, "Fat Man." According to McLaurin, "Fat Man" knew about McLaurin's having the drugs and the money in his house because "Fat Man" had given him a large quantity of drugs as collateral for a $5,000 loan.
 {¶ 13} Dallas King testified that he was currently in jail for the robbery. According to King, on the day of the robbery, he and Tonja Snyder met with Moore and Tefawn Myers in the early afternoon. Moore told King that he knew of an apartment they could rob on Paxton Avenue. They set up their plan to ask about the upstairs apartment. According to King, after looking at the apartment, he reported back to Moore and told him that the woman was home and that she had a dog. They then decided he and Snyder would go back in to say they lost their keys.
 {¶ 14} King testified that after looking for the keys in the apartment, he used the woman's telephone to page Moore. He then went to the bathroom to get Snyder. By the time he returned to the front room, Moore was in the apartment holding a gun to Penn's head and telling her to lie down. Penn's dog was placed in the closet. King testified that Barrow then restrained the woman with duct tape. According to King, they took a rifle from the bedroom closet and a metal safe that Barrow found under the bed. In the safe was $14,000, which Barrow, Moore, and King split between them.
 {¶ 15} King testified that Moore and Barrow were not wearing masks at the time of the robbery, but hooded sweatshirts. King admitted that he was mad at Moore for not posting his bail after he was arrested and admitted that he did not make a statement to the police implicating Moore until he had been held in jail for approximately one month.
 {¶ 16} Tefawn Myers testified that she had a child with King. She stated that Moore and King were cousins. On the day of the robbery, she was with Moore when they met King and Snyder. She overheard the men discussing the plan to rob someone. Later that evening, when she saw King at his sister's birthday party, she noticed he had a large amount of cash. She admitted on cross-examination that she initially did not tell police that Moore was involved in the robbery, because she did not want to implicate him if they were not investigating the same robbery. She also stated that she was reluctant to give information, because she was afraid of Moore, who had gone to prison for shooting his best friend.
 {¶ 17} Tonja Snyder testified that she was King's girlfriend at the time of the robbery. She admitted she went to the duplex to look at an apartment, but claimed she knew nothing about the robbery plans. She stated that she never met with Moore or Myers prior to going to Paxton Avenue, which conflicted with the testimony of both Myers and King. She stated that when she came out of the bathroom she was shocked to see Barrow taping the woman. She also claimed that Barrow had a gun and he grabbed her by the arm and, while pointing the gun at her stomach, told King, "You better tell your girl how Cleveland really is." Snyder identified Moore and Barrow from photos.
 {¶ 18} On cross-examination, she admitted that although she testified that Moore was present, she never told the police this during her initial statement.
 {¶ 19} Based on this evidence, the jury found Barrow guilty of aggravated burglary, aggravated robbery, and kidnapping. Barrow was found not guilty of felonious assault and the firearm specifications. The trial court sentenced Barrow to ten years on each count, to run concurrently.
 {¶ 20} Barrow raises four assignments of error on appeal.
 Prosecutorial Misconduct {¶ 21} In his first assignment of error, Barrow contends that he was denied a fair trial due to prosecutorial misconduct. Specifically, Barrow contends that the prosecutor offered perjured testimony as evidenced by the witnesses' inconsistent testimony regarding who had the gun.
 {¶ 22} The Ohio Supreme Court held in State v. Iacona,93 Ohio St.3d 83, 104, 2001-Ohio-1292:
 {¶ 23} "[I]n State v. Staten (1984), 14 Ohio App.3d 78, 14 Ohio B. Rep. 91, 470 N.E.2d 249, in which the court held that a prosecutor's duty of assuring that a criminal defendant receives a fair trial includes an obligation to (1) refrain from knowingly using perjured testimony, (2) disclose evidence favorable to the accused, and (3) correct testimony he knows to be false. Id. at paragraph one of the syllabus. However, Staten
further held that, in such situations, the issue devolves into an inquiry as to whether a failure to correct misleading testimony rises to the level of prosecutorial misconduct so as to deprive a defendant of due process. `The appropriate standard of review therefore is to determine * * * whether the prosecutor's misconduct may have been so egregious so as to deny [the defendant] the fundamental right to a fair trial.' Id. at 85, 14 Ohio B. Rep. at 98, 470 N.E.2d at 256-257."
 {¶ 24} In the instant case, the witnesses all agreed to the core facts of the case, that Barrow and Moore along with King and Snyder were in the apartment, and that at least Barrow and Moore entered the premises without permission. The witnesses also testified that Barrow restrained the victim by duct-taping her and that the intruders then ransacked the house and took money. The only material inconsistency was which of the defendants was holding the gun.
 {¶ 25} The jury, however, found that no gun was involved by finding Barrow and Moore not guilty of felonious assault and the firearm specifications. Therefore, the inconsistent testimony did not affect Barrow's due process rights, but instead worked in his favor.
 {¶ 26} Barrow's first assignment of error is overruled.
 Maximum Sentence {¶ 27} In his second assignment of error, Barrow contends that the trial court erred in sentencing him to the maximum term because his convictions were not the worst form of the offense.
 {¶ 28} In imposing the maximum sentence, the trial court was required to make a finding that Barrow fit within one of the categories set forth in R.C. 2929.14(C) and to give its reasons for its finding.State v. Edmonson (1999), 86 Ohio St.3d 324.
 {¶ 29} On the record, the trial court stated that the case constituted the worst form of the offense, which is one of the categories set forth under R.C. 2929.14(C). In support of this finding, the trial court stated:
 {¶ 30} "In this case, the Court finds that this was indeed a heinous offense for anyone to be accosted in their own home during daylight hours. I believe the best testimony put this between 4:00 and 5:00 p.m., I think makes the entire community afraid. And it is exactly the type of crime which we need to protect the public against. And, therefore, I do find that this is the worst form of aggravated burglary, aggravated robbery and kidnapping."
 {¶ 31} The court's statement that the offenses were the kind that "makes the entire community afraid" was an obvious reference to the manhandling the nine-months pregnant victim suffered at the hands of Barrow and the others. Moreover, the court's statement that "this is exactly the type of crime which we need to protect the public against" is a recognition of society's abhorrence to crimes of violence perpetrated against obviously pregnant women.
 {¶ 32} We find the above statement adequately sets forth the court's reasons to support imposing the maximum sentence. Accordingly, Barrow's second assignment of error is overruled.
 Sufficiency and Manifest Weight of the Evidence {¶ 33} In his third and fourth assignments of error, Barrow contends that due to the witnesses' inconsistent testimony regarding who possessed the firearm, whether one of the men was white, and whether the men were wearing masks, that the evidence was insufficient to support his convictions and that his convictions were against the manifest weight of the evidence.
 {¶ 34} The standard of review with regard to the sufficiency of evidence is set forth in State v. Bridgeman (1978), 55 Ohio St.2d 261, syllabus:
 {¶ 35} "Pursuant to Criminal Rule 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." See, also, Statev. Apanovitch (1987), 33 Ohio St.3d 19, 23; State v. Davis (1988),49 Ohio App.3d 109, 113. Bridgeman must be interpreted in light of the sufficiency test outlined in State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, in which the Ohio Supreme Court held:
 {¶ 36} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence submitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (Jackson v. Virginia [1979],443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, followed.)"
 {¶ 37} When the argument is made that the conviction is against the manifest weight of the evidence, the appellate court is obliged to consider the weight of the evidence, not its mere legal sufficiency. The defendant has a heavy burden in overcoming the fact finder's verdict. As this court has stated:
 {¶ 38} "The weight to be given evidence and the credibility of witnesses are determinations to be made by the triers of fact. State v.Thomas (1982), 70 Ohio St.2d 79, 24 O.O.3d 150, 434 N.E.2d 1356. If there was sufficient evidence for the triers of fact to find defendant guilty beyond a reasonable doubt this court will not reverse a guilty verdict based on manifest weight of the evidence. State v. Brown (1988),38 Ohio St.3d 305, 528 N.E.2d 523, paragraph four of the syllabus, certiorari denied (1989), 489 U.S. 1040, 109 S.Ct. 1177,103 L.Ed.2d 239." State v. Rios (1991), 75 Ohio App.3d 288, 291. See, also, State v.Jenks (1991), 61 Ohio St.3d 259, 273.
 {¶ 39} As stated above, the jury found Barrow not guilty of the firearm specifications and not guilty of felonious assault. He was convicted of aggravated robbery, aggravated burglary, and kidnapping.
 {¶ 40} According to Barrow's indictment, his convictions for aggravated burglary and aggravated robbery did not require use of a firearm, but allowed for a conviction based on attempted or actual harm to the victim. The use of a firearm was part of an "and/or" provision in the indictments. The kidnapping charge contained firearm specifications, but also stated that the victim was restrained for "purpose of facilitating the commission of a felony or the flight thereafter." Therefore, a firearm was not necessary for that offense.
 {¶ 41} The evidence in the instant case supported a finding that the victim could have been seriously harmed. Barrow hog-tied the victim, who was nine months pregnant, by taping her wrists to her ankles. This was a very precarious position to restrain a victim who was nine months pregnant and past her due date. If the stress had induced labor, the results might have been tragic. The evidence was therefore sufficient to support Barrow's convictions, even though the testimony regarding the gun was inconsistent and the jury found Barrow not guilty of felonious assault and the firearm specifications, both of which required the use of a firearm.
 {¶ 42} The victim testified that the second man, Barrow, could have been white. However, in her statement to police immediately after the incident, she described the intruders as one white female and three black males.
 {¶ 43} The victim also stated that the two men, Moore and Barrow, were wearing masks over their mouths, while the other witnesses testified that Moore and Barrow were wearing hooded jackets. However, Snyder testified that the hoods were pulled tight so that only their faces were showing. Therefore, it is quite possible that the men had the hooded jackets drawn up over their mouths. A black mask that would only have covered the mouth was also found at the scene and could have been worn under the hooded jacket.
 {¶ 44} Because the victim, King, and Snyder all testified that Barrow duct-taped the victim, the evidence was sufficient to support Barrow's convictions and his convictions were not against the manifest weight of the evidence.
 {¶ 45} Barrow's third and fourth assignments of error are overruled.
Judgment affirmed.
PATRICIA A. BLACKMON, P.J., CONCURS.
[1] This case was consolidated with Case No. 80416; however, because each appeal involves a different defendant and assigned errors, for ease of discussion, we will address each in a separate opinion.
COLLEEN CONWAY COONEY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE OPINION.