[Cite as *State v. Young*, 2021-Ohio-2541.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2020-04-052 |
| | : | O P I N I O N |
| - vs - | | 7/26/2021 |
| | : | |
| DUSTIN YOUNG, | : | |
| Appellant. | : | |


CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2017-04-0695


Michael T. Gmoser, Butler County Prosecuting Attorney, and Stephen M. Wagner, Assistant Prosecuting Attorney, for appellee.

Repper-Pagan Law, Ltd., and Christopher J. Pagan and Jacob D. Long, for appellant.


**HENDRICKSON, J.**

{¶1} Appellant, Dustin Young, appeals from his convictions in the Butler County Court of Common Pleas for gross sexual imposition and abduction. Young also appeals from the trial court's denial of his two motions for new trial. For the reasons set forth below we affirm the denial of Young's motions for new trial and uphold his convictions.

## I. FACTS & PROCEDURAL HISTORY

### A. Bench Trial

{¶2} This court previously set forth the relevant facts relating to Young's convictions in *State v. Young*, 12th Dist. Butler No. CA2018-03-047, 2019-Ohio-912, ¶ 2-22, and they are again set forth herein. On April 26, 2017, Young, a police officer employed by a public university's police department, was indicted on one count of gross sexual imposition in violation of R.C. 2907.05(A)(1), a felony of the fourth degree (count one); one count of kidnapping in violation of R.C. 2905.01(A)(4), a felony of the second degree (count two); and two counts of abduction in violation of R.C. 2905.02(A)(2), felonies of the third degree (counts three and four). The charges arose out of three separate incidents occurring during the fall of 2016. Counts one and two related to an incident in which it was alleged that Young had sexual contact by means of force or the threat of force with K.K., a female coworker employed as an emergency dispatcher. Young used his arm to hook K.K. between her legs, pull her down onto his lap, and, while holding K.K. on his lap, rubbed his arm on her vagina and grabbed one of her breasts with his hand for the purpose of sexual arousal and gratification. Count three related to a second incident, in which it was alleged that Young abducted K.K. while the two were at work. Young grabbed K.K. and pushed her back against lockers, thereby placing K.K. in fear. Finally, with respect to count four, on or about November 14 or 15, 2016, Young was alleged to have abducted K.K. a second time at work. Young grabbed K.K. in a manner that caused her to hit her head on a metal bookcase before pushing her back and pinning her against some lockers, thereby placing her in fear.

{¶3} Young pled not guilty to the charges and, in October 2017, a three-day bench trial was held. At trial, K.K. testified she and Young began working together more than five years ago. The two had exchanged their private cellphone numbers so that personal and job-related text messages could be exchanged. K.K. explained that she and Young had become friends but, at some point in time, the nature of their relationship changed.

According to K.K., it "got to the point where [Young] wanted more than I did." Young started sending K.K. "inappropriate" text messages. K.K. did not approach her superiors at work because she felt she could handle things. However, sometime after May 2016, Young became more aggressive. On one occasion, Young grabbed K.K.'s buttocks when she walked by him at work.

{¶4} Regarding counts one and two, K.K. testified that on one evening in the fall of 2016, while in the communications center at work, Young grabbed her and pulled her onto his lap. According to K.K., she went to pick up papers from a printer and Young "put his right arm between [her] legs, to where his hand was on the back of [her] butt and his arm was up between [her] legs." Young pulled her to the chair he was sitting on and then, using his left hand, grabbed her shoulder to spin her around before pulling her down onto his lap. K.K. stated that Young's arm between her legs was moving and his forearm rubbed her genitalia in both a back-and-forth and side-to-side motion. His hand that was over her shoulder was touching her breast and he was biting at and trying to kiss the back of her neck. Young asked K.K., "When are you going to let me do this to you outside of work?" K.K. told Young to "let go" before pushing off of him and going back to her own workstation.

{¶5} A few weeks later, the incident relating to count three occurred. K.K. testified she was entering the communications room after going to the restroom when Young, who was standing near some lockers, grabbed her by her shoulders and upper arms, spun her around, and pushed her up against the lockers. K.K. testified Young tried to kiss her and again asked her when she was going to allow him to do these things to her outside of work. Young used his body weight to keep her against the lockers, and K.K. stated she felt "trapped," "scared," and "mad."

{¶6} K.K. then testified about the incident relating to count four, which occurred while she was working third shift on November 14, 2016. K.K. testified that as she walked

into the communications center after going to the breakroom, Young grabbed her, causing her head to hit a metal bookshelf. Young then spun her around, pushed her up against the lockers, and pinned her there using his body weight and holding onto her arms. Young told K.K., "I know you like to be manhandled," and he again asked her when she was going to let him do this to her outside of work. K.K. testified she was "really scared" during this event, as she "didn't know if it was ever going to stop or how bad it might get."

{¶7} K.K. explained that no one else was present when the incidents described above occurred and she did not immediately report Young's conduct. Eventually, K.K. told her superior about the incidents and she provided him with a written statement on November 22, 2016.

{¶8} K.K. also gave a statement to two city of Hamilton police detectives on November 22, 2016. On cross-examination, K.K. acknowledged that during her interview Detective Jon Richardson and Detective Mark Nichols asked her whether Young had ever touched her genitalia or breasts, and she responded "no." However, K.K. explained that she believed the detectives' question was asked to find out if there were other incidents in addition to those she had already disclosed to the officers. K.K. further acknowledged that she told the detectives that Young "never touched [her] inappropriately sexually." She also admitted that notes describing the offenses to the university's "OEEL" office did not indicate Young touched her breasts or that when Young's forearm was between her legs, he was moving it to rub against her genitalia. Finally, on cross-examination, K.K. acknowledged that on October 29, 2016, she went to a college hockey game and stood next to Young for the duration of the game. Young had purchased a hockey shirt for her to wear but she denied wearing it to the game.

{¶9} K.K. also testified about the text messages she received from Young. Although Young had sent her a number of text messages on her personal cell phone, K.K.

had not saved the messages. Rather, she had deleted the messages from Young. However, she provided her cell phone to law enforcement and they were able to recover some of the text messages she and Young had exchanged from April 2016 through November 2016. In the texts sent by Young, he frequently called K.K. "baby" and asked how her day was going. On October 24, 2016, Young sent K.K. a message stating "Your ass is amazing. I want to feel it again very soon." Then, on November 5, 2016, the following text messages were exchanged:[1]

> YOUNG (3:54:13 AM): I know baby. It's no big deal but I'm going to steal a big hug and a few of your sexy or two for it. Hehe
>
> K.K. (3:54:58 AM): Your going to take my sexiness!
>
> YOUNG (3:56:02 AM): Lol feel of your sexy ass!! It's hard…. to text and drive.
>
> K.K. (3:57:10 AM): I know
>
> Young (4:00:59 AM): Are you alright with that?
>
> K.K. (4:01:30 AM): Depends on what that means
>
> YOUNG (4:02:44 AM): I thought about pushing you over my desk and getting a really good feel
>
> K.K. (4:03:25 AM): Now that's a bit much
>
> YOUNG (4:04:07 AM): That's just a little bit much?
>
> YOUNG (4:06:35 AM): I will try not to cross the line to much.
>
> K.K. (4:07:48 AM): Again, uh huh

{¶10} Detective Richardson testified about his investigation of K.K.'s claims. Richardson noted that Young was much larger in stature than K.K. He approximated that

---

1. Testimony from trial demonstrated that the time stamps on the text messages recovered from K.K.'s phone were for "Greenwich Mean Time or GMT or UTC minus zero." To convert the time to eastern standard time, accounting for daylight savings time, four hours had to be subtracted. This meant that the texts set forth in the body of the opinion were sent and received between 11:54 p.m. on November 4, 2016 and 12:07 a.m. on November 5, 2016.

Young was 6' 2" tall and weighed around 250 pounds while K.K. was only "5-ish" feet tall and weighed between 120 and 130 pounds.

{¶11} Richardson explained that Young was interviewed on November 28, 2016. The interview was recorded, and the recording was played at trial. During the interview, Young admitted he had a "friendship" with K.K. but denied that any sexual contact between the two of them had occurred. Young acknowledged that both he and K.K. sent inappropriate and flirtatious texts, including K.K. sending him photographs of herself in her underwear and bra, but he was unable to produce the text messages or photographs as he had deleted them and had recently gotten a new phone.

{¶12} Richardson was cross-examined about his November 22, 2016 interview of K.K. Richardson testified that K.K. was specifically asked whether Young had ever touched her breasts or vagina, and K.K. stated that Young never did anything physically inappropriate with her.

{¶13} Detective Walter Schneider, a digital forensic examiner, testified that he specializes in the recovery of data and extraction of evidence from computer and cellphone devices. On December 23, 2016, using a "Cellebrite" program, Schneider was able to conduct an advanced logical extraction of deleted data from K.K.'s cellphone. Schneider recovered some deleted text messages sent between Young and K.K. However, as Schneider explained, not all deleted material on K.K.'s phone could be recovered as "[s]ome things [were] overwritten" by new data after being deleted. Schneider stated he was not able to recover any data from Snapchat.

{¶14} Following Schneider's testimony, Young moved for acquittal pursuant to Crim.R. 29. His motion was denied. Thereafter, he presented testimony from officers he worked with in the university's police department. Sergeant Andrew Rosenberger testified that he was aware that Young purchased a hockey shirt for K.K. and that she had worn it

to a game held on October 29, 2016. After the game, K.K., Young, and Rosenberger had returned to the university's police station. There, K.K. told Rosenberger that the shirt she had on was bought by Young. Further, that evening, K.K. came into his office and closed the door. K.K. told Rosenberger that she was "just trying to make him jealous" and pointed to an area where Young had been standing.

{¶15} Young also presented testimony from Detective Nichols, who stated that when K.K. was interviewed on November 22, 2016, she did not provide specific details about her vagina being touched when she described the incident where Young pulled her onto his lap. K.K. did mention that Young reached between her legs and hooked her, which Nichols "took * * * as a possibility" that he rubbed her vagina, but K.K. herself did not state that Young rubbed her vagina by moving his arm up and down or back and forth.

{¶16} On October 13, 2017, after hearing the foregoing testimony, the trial court found Young guilty of gross sexual imposition and abduction, as set forth in counts one and four, and not guilty of kidnapping and abduction, as set forth in counts two and three. The trial court journalized its verdict on October 18, 2017. The trial court then set the matter for sentencing.

{¶17} On December 13, 2017, prior to Young's sentencing but nearly two months after the court rendered its verdict, Young filed a motion for leave to file for a new trial based on an irregularity in the proceedings. Young, represented by new counsel, indicated that after trial, on or about December 7 or 8, 2017, his original trial counsel was alerted to the existence of "new" photographic evidence consisting of a Snapchat photograph of K.K.[2] The photograph contains a banner across it that reads "More room to bend me over here"

2. Young was represented by three attorneys at trial. Following the court's guilty verdict, but before sentencing, Young retained new counsel to handle his motion for leave to file for a new trial. Young's "new counsel" also represents him on appeal.

and shows K.K. with her top lifted and her bare breasts exposed. Although this photograph is referred to as "new photographic evidence," Young's original trial counsel acknowledged that the photograph had been provided to the defense during discovery. However, Young's original trial counsel claimed they were "unaware of it until after judgment" and that Young had not been informed of the photograph's existence until December 7, 2017.

{¶18} In support of his motion for leave to file a motion for new trial, Young submitted four affidavits, of which three were from his original trial attorneys and one was from his wife.[3] In the affidavits from his trial attorneys, Young's attorneys stated that the "new photograph had a date stamp of [8] November 16," that the "new photograph was close in time with a text message the court relied upon in convicting [Young] for his charged offenses" and the photograph was "not considered while consulting with [Young] regarding defense theories or for impeachment purposes." Young's lead trial attorney's affidavit stated that upon receiving the "new photograph," he reached out to the prosecutor, who "indicated the picture was not new and had been provided in discovery in the phone data dump. * * * Over the weekend, [lead defense counsel] reviewed the discovery and found the photograph – which * * * had not [been] seen before."

{¶19} Young's wife's affidavit stated that in December 2017, she accessed Young's Snapchat account and discovered that Young and K.K. were friends on Snapchat. She further stated that on October 31, 2016 and November 19, 2016, K.K. and Young exchanged private Snapchat messages with one another. According to Young's wife, based on her experience with Snapchat, she knew that "Snapchat images disappear after

---

3. We note that on February 2, 2018, the trial court sealed the copies of the affidavits filed in support of Young's motion for leave to file a motion for new trial. The sealed affidavits were later referenced by the court at Young's sentencing hearing, held February 28, 2018. Pursuant to App.R. 9(E), the record on appeal was supplemented to include the affidavits filed under seal. *See State v. Young*, 12th Dist. Butler No. CA2018-03-047 (Feb. 27, 2019) (Entry Supplementing Record on Appeal); *State v. Young*, 12th Dist. Butler No. CA2020-04-052 (Apr. 15, 2021) (Entry Supplementing Record on Appeal).

a certain time, that the time the image will remain visible is represented by a number found at the top of the image, that a sent image can be saved to the recipient's Snapchat program or screenshotted by the recipient, and that the sender can include a message with the sent image that is depicted over the top of the sent image." Attached to Young's wife's affidavit were images of Young's phone that showed K.K. and Young were friends on Snapchat.

{¶20} The state filed a memorandum in opposition to Young's motion for leave to file for a new trial, arguing that the photograph of K.K. was not "newly discovered" evidence as it was provided to defense counsel during discovery on May 12, 2017. Furthermore, the state argued that if the photograph had, in fact, been sent by K.K. to Young, then Young should have known about the photo before trial and instructed defense counsel to look for it. As the state argued, "despite [Young] being repeatedly asked to describe flirtatious texts during his interview with Hamilton Police, * * * he never once indicated that he had seen or been sent topless pictures by the victim – he stated that the victim would only ever show pictures of herself in underwear and bra." The state contended that Young's argument that his trial strategy would have been different as a result of this one photograph was "disingenuous."

{¶21} On February 27, 2018, the trial court issued a decision denying Young's motion for leave to file a motion for new trial. The court found that Young failed to demonstrate by clear and convincing evidence that he was unavoidably prevented from filing his motion for new trial as his attorneys were given the photograph prior to trial and he failed to establish that he received ineffective representation by his trial attorneys.

{¶22} After denying Young's motion for leave to file for a new trial, the trial court sentenced Young to five years of community control. The court also classified Young as a Tier I sex offender.

**B. Prior Appeal**

{¶23} Young appealed his convictions and the denial of his motion for leave to file for a new trial in *State v. Young*, 2019-Ohio-912. We determined that while the state had presented sufficient evidence to support Young's conviction for gross sexual imposition, the trial court erred by denying Young's motion for leave to file for a new trial. *Id.* at ¶ 39, 50. We noted that in denying Young's motion for leave to file for new trial, the court had "conflated two distinct issues. Rather than limiting its analysis to the issue of whether Young was unavoidably prevented from discovering his claim of an irregularity in the proceedings due to counsels' alleged ineffective assistance, the trial court improperly analyzed the merits of Young's right to a new trial." *Id.* at ¶ 37. We therefore reversed the trial court's decision and remanded the matter to allow Young to file his motion for leave for new trial so that he would have "the opportunity to demonstrate how knowledge of the photograph's existence and how use of the photograph at trial would have resulted in a different outcome." *Id.* at ¶ 38. We also determined that two assignments of error Young raised relating to evidentiary issues and an assignment of error asserting a claim of cumulative error were not yet ripe for review. *Id.* at ¶ 51-57.

**C. Motion for New Trial – Snapchat Photograph**

{¶24} On remand, Young filed his motion for new trial arguing that trial counsel was deficient for failing to find and use the Snapchat photograph at trial or in pursuing available defenses to the charges Young faced. Young argued he was prejudiced by counsels' deficient performance as the photograph could have been used to (1) bolster his defenses that the touching was consensual or did not happen, as K.K.'s taking and sending of the intimate photograph on November 8, 2016 is conduct incompatible with her claims that she was assaulted by Young, (2) impeach K.K.'s testimony and pretrial statements by providing important context about K.K.'s and Young's consensual relationship, which was probative

to the nonconsensual elements of the gross sexual imposition and abduction convictions, and (3) create reasonable doubt as to the nonconsensual elements of both convictions as the photograph was taken within three days of the text message Young sent K.K. in which he stated, "thought about pushing you over my desk and getting a really good feel." As the state's case did not include a confession, an eyewitness to the events, or scientific proof, but rather merely rested on K.K.'s testimony, Young contends the Snapchat photograph is evidence which undermines confidence in the outcome.

{¶25} In support of his motion for new trial, Young submitted affidavits from his three trial attorneys, his own affidavit, a copy of the Snapchat photograph at issue, a screenshot of a female in a "sexy cop" outfit, a digital log of photographs taken from K.K.'s phone that was provided during discovery, and a transcript of a portion of Young's interview with law enforcement from November 28, 2016.[4] In his affidavit, Young states that he and K.K. were friends on Snapchat and they exchanged private messages with one another using Snapchat up until November 19, 2016. These exchanges included K.K. sending Young photographs of herself. Young stated that he and K.K. also sent private text messages to one another. According to Young, "K.K. voluntarily showed [him] numerous naked photographs of her body during the course of [their] employment and personal relationship," and she did so "through Snapchat, text message, and by handing [him] her phone and having [him] look at the image." Regarding the November 8, 2016 Snapchat photograph, Young noted that the photograph had been marked "counsel only" pursuant to Crim.R. 16 and that he had only been provided with a description. Young claimed he was unable to determine from counsel's description whether or not he had seen the photograph.

4. On April 29, 2019, the trial court sealed the copies of the affidavits and exhibits filed in support of Young's motion for new trial. Pursuant to App.R. 9(E), the record on appeal was supplemented to include the sealed affidavits and exhibits. *See State v. Young*, 12th Dist. Butler No. CA2020-04-052 (May 25, 2021) (Entry Granting Motion to Supplement the Record).

Nonetheless, Young stated that "[i]f trial counsel had informed [him] of the [Snapchat] photograph * * * [he] would have testified in [his] own defense at trial regarding the nature of [his] relationship with K.K."

{¶26} The state filed a memorandum in opposition to Young's motion for new trial, arguing that a new trial was not warranted as Young's trial counsels' performance was not deficient and, even if it was, any failure of defense counsel to use the Snapchat photograph was not prejudicial. The state noted that while the Snapchat photograph was dated November 8, 2016, there was no evidence to establish whether the photograph was taken on this date, sent on this date, or merely saved on K.K.'s phone on this date. The state further contended that there was no proof that K.K. ever sent the photograph to Young, and Young never indicated receipt of the photograph, as evidenced by the fact that Young indicated he only saw photographs of K.K. in her bra and underwear when interviewed by the Hamilton detectives.

{¶27} The state also argued that Young's affidavit attached in support of his motion for new trial was self-serving and did not support his claim of prejudice. The state noted Young's trial counsel had presented a consent defense in addition to a fabrication defense at trial and argued that use of the Snapchat photograph would not have had an effect on the consent defense or the overall outcome of trial.

### D. Motion for New Trial – K.K.'s Undisclosed Financial Interest

{¶28} On August 13, 2019, while Young's original motion for new trial remained pending, defense counsel sought leave to file an additional motion for new trial pursuant to Crim.R. 33 on the basis of (1) an irregularity in the proceedings, (2) misconduct by a state's witness, (3) accident or surprise which ordinary prudence could not have guarded against, and (4) the discovery of new evidence material to the defense. Young contended that K.K. had an undisclosed financial interest in the outcome of trial, which neither K.K. nor the state

had disclosed prior to trial and of which he had not learned about until after trial when the public university that employed K.K. responded to his fourth public-records request. The documents turned over as public records demonstrated that prior to trial, K.K. had made a demand on the university for settlement, exchanged offers and counteroffers for settlement and, when negotiations failed, filed a claim with the Equal Employment Opportunity Commission (EEOC) in order to preserve her ability to sue the university under Title VII. Young noted that when K.K. was cross-examined at trial about her financial interest in the outcome of the case, she did not disclose any of these events. K.K. merely indicated that while she had an attorney, she did not intend to sue the university over the events that transpired with Young.

{¶29} The state filed a memorandum in opposition, arguing that Young's motion was untimely as it was filed more than 660 days after the court's guilty verdict and Young had not been unavoidably prevented from moving for new trial within the timeframe required by Crim.R. 33. The trial court ultimately determined that Young had been unavoidably prevented from filing his motion and granted him leave to file a second motion for new trial.

{¶30} On February 26, 2020, Young filed his second motion for new trial under seal. Young supported his motion with affidavits from his lead trial attorney and the office manager of his appellate/new counsel.[5] The officer manager attested that after Young's trial, Young's new counsel filed five different public-records requests with the university that employed K.K., seeking information relating to any settlement agreement between K.K. and the university as a result of K.K.'s allegations against Young. Requests were made on December 22, 2017, April 19, 2018, June 28, 2019, July 5, 2019, and July 30, 2019. In

---

5. When Young filed his motion for leave to file his second motion for new trial, he supported the motion for leave with an affidavit from the office manager. The office manager referenced and incorporated this prior affidavit in her sealed affidavit in support of the motion for new trial.

between the fourth and fifth request, the university confirmed the settlement agreement between K.K. and the university and provided the office manager with a copy of the agreement, which was entered into in May 2018. However, it was not until August 2, 2019, after the fifth public-records request had been made, that documents and correspondence pertaining to K.K.'s demand for compensation, negotiations between K.K. and the university, and documents pertaining to K.K.'s EEOC claim were provided by the university. The office manager's public-records requests and the university's responses were attached as exhibits. The exhibits demonstrate that K.K. first made a demand for compensation from the university on April 27, 2017 – more than five months before Young's trial commenced, and that after settlement negotiations between the university and K.K. fell through, she filed her EEOC claim on or about August 9, 2017 – two months before Young's trial commenced.

{¶31} In his affidavit, Young's lead trial attorney attested that neither he nor the other two trial attorneys representing Young knew at the time of trial that K.K. had made a demand for compensation, that K.K. and the university had exchanged offers and counteroffers to settle the claim, that K.K. had filed an EEOC charge, or that the university had filed an EEOC position paper denying liability. Lead counsel stated he had not been advised of the demand, settlement, or EEOC charge by the prosecutor, presumably because the prosecutor did not know about the demand, or by the university or the EEOC. Lead counsel contended that K.K. concealed the demand, settlement negotiations, and EEOC charge and, when cross-examined about suing the university during trial, misleadingly stated that she would never sue the university. Lead counsel indicated his belief that K.K. lacked a financial interest in the case was further strengthened by the prosecutor's closing argument at trial, wherein the prosecutor argued K.K.'s testimony should be believed as she lacked a financial interest in the case. Finally, lead counsel attested that had he or Young's other trial counsel known of the settlement negotiations or K.K.'s EEOC claim, they would have

(1) argued K.K.'s financial interest explained the difference between her exculpatory statement to Hamilton detectives (when she lacked an interest) and her inculpatory trial testimony (when she had a pending interest), (2) impeached K.K. for bias and a motive to misrepresent, (3) argued K.K.'s financial interest created reasonable doubt, and (4) reconsidered the tactic of a bench trial.

{¶32} The state filed a memorandum in opposition to Young's motion for new trial, arguing that Young had not been prevented from discovering evidence of K.K.'s financial interest in the action prior to trial as the state's Fourth Supplemental Discovery Response from September 12, 2017 disclosed that it had "been informed that, as of mid-August, there was a pending complaint by K.K. with * * * [the] University with some relation to the indicted events. The status of the complaint is unknown." The state indicated it had provided defense counsel with all the information it possessed with respect to K.K.'s financial interest in the proceedings and that the provided information should have put defense counsel on notice that they needed to further investigate the existence, substance, and status of any claim by K.K. against the university for compensation resulting from Young's actions. The state also argued that rather than waiting until after December 22, 2017, more than two months after trial, to file a public-records request with the university, Young's trial counsel could have subpoenaed records and university personnel to obtain additional information about K.K.'s financial interest.

{¶33} As for Young's claims of surprise and an irregularity in the proceeding, the state argued it had no duty to look for and gather exculpatory evidence relating to K.K.'s potential financial interest in the case, but rather merely had the burden of disclosing any material evidence *that it possessed* to Young prior to trial. It contends it did so in its supplemental discovery responses and that defense counsel failed to exercise reasonable prudence by neglecting to follow up on the discovery disclosure or ask K.K. further

questions about her financial interest in the action at trial. The state noted that there was no evidence that K.K. lied or committed misconduct when she testified at trial that she did not intend to sue the university, despite having retained counsel. K.K.'s trial testimony was truthful – she never filed a lawsuit against the university. If defense counsel wanted to know if K.K. had filed a demand or was seeking any compensation from the university in relation to Young's actions, defense counsel could have asked these additional questions on cross-examination. Likewise, defense counsel could have asked K.K. about her pending EEOC complaint against the university. The state argued defense counsels' decision not to do so was part of counsels' trial strategy.

### E. Trial Court's Ruling on Young's Motions for New Trial

{¶34} The judge who presided over Young's bench trial recused himself from the case and Young's motions for new trial were assigned to a different judge. On March 27, 2020, the newly assigned judge rendered a decision denying both of Young's motions for new trial after "review[ing] every word of every transcript of every proceeding held by the trial court, including the three-day bench trial; the trial exhibits; the original official court file; all of the motions filed on the issues; the affidavits submitted by Defendant in support of his motions and all exhibits submitted by both parties in support of their respective position."

### 1. The Snapchat Photograph

{¶35} With respect to Young's motion for new trial based on the discovery of the Snapchat photograph, the trial court determined that Young could not demonstrate he was prejudiced by defense counsel overlooking the photograph. The court found that the Snapchat photograph was not a "smoking gun" that would have changed the outcome of trial and its existence did not undermine the court's confidence in the original verdict. In so finding, the court noted that it would not place "undue value" on statements in Young's affidavit, as such statements were given "without being subject to the crucible of cross-

examination." The court took particular issue with paragraphs 17 and 18 of Young's affidavit, noting the paragraphs were "self-serving" and of limited value. These paragraphs provided:

> 17. K.K. voluntarily showed me numerous naked photographs of her body during the course of our employment and personal relationship.
>
> 18. K.K. showed me naked photographs of her body through Snapchat, text message, and by handing me her phone and having me look at the image.

The trial court noted, "[t]here was neither admitted evidence nor testimony that these assertions are true." In fact, in his interview with Hamilton detectives, Young denied that he received nude photographs of the victim.

{¶36} The court also noted that if Young's assertions in his affidavit were true, then Young should have told his trial counsel this information so that it could have been used during cross-examination of K.K. at trial. Further, if Young did tell his trial counsel about the nude photographs and counsel did not use this information, the court believed Young's affidavit would have pointed this out, as "[s]tating that his trial attorneys ignored something as crucial as [Young] telling them about nude photographs is a much more solid assertion than stating that his attorneys had such a photograph and just completely missed it."

{¶37} Finally, the trial court found the fact that the Snapchat photograph had a metadata date of November 8, 2016, which was only three days after Young sent a text to the victim about "pushing [her] over [his] desk and getting a really good feel," was not relevant and "prove[d] nothing to [the] Court." Specifically, the court found the photograph did not have "any relevance or value to the issues of gross sexual imposition or abduction, or the issue of impeachment" as there was no evidence the photograph was ever sent or displayed to Young or that Young had any knowledge of the photograph's existence prior to it being discovered by defense counsel in December 2017.

## 2. K.K.'s Undisclosed Financial Interest

{¶38} As for Young's motion for new trial on the basis of K.K.'s undisclosed financial interest, the trial court determined that Young's arguments under Crim.R. 33(A)(1), (2), (3), and (6) were without merit. With respect to Young's witness misconduct argument, the trial court noted that there was no evidence that K.K. lied or misled anyone when she answered defense counsels' questions about her financial interest in the case. K.K. testified that though she had retained counsel, she had not filed a lawsuit against the university over the incident and "there's not going to be [one]." Nothing submitted by Young in support of his motion for new trial demonstrated this testimony was false; rather, "[a]ll of the evidence shows that [K.K.] answered the questions that were asked of her." The trial court found that K.K.'s testimony that there was not going to be a lawsuit "may have been her understanding based on conversations with her attorneys" and "may have accurately reflected a lack of desire on her part to take the matter as far as a formal lawsuit." Additionally, the court determined K.K. had no obligation to correct the prosecutor's statement during closing arguments that K.K. should be believed because she lacked a financial interest in the case. The court noted that there was no evidence that K.K. had been in the courtroom during closing arguments and, even if she had, "it was not reasonable to envision a scenario in which an attorney is giving closing argument and a witness corrects that attorney."

{¶39} With respect to Young's "new evidence" arguments under Crim.R. 33(A)(6), the trial court noted that the state's June 2017 and September 2017 discovery responses demonstrate that a complaint had been filed by K.K. with the university and that a "GoFundMe" page had been started by a university police officer for the benefit of K.K. and her family. The court found this information was sufficient to allow defense counsel to cross-examine K.K. about her financial interest. There were no constraints placed on defense counsels' ability to ask generally, without violating attorney-client privilege, if K.K. was

aware of whether there had been any settlement discussions between her attorney and the university or if a formal complaint had been filed with the EEOC. Further, even with K.K.'s assertion that there was not going to be a lawsuit, defense counsel was not prevented from arguing K.K. had a financial interest during closing arguments.

{¶40} The court also found that in light of other impeachment evidence presented at trial, there was not a strong probability that further information regarding K.K.'s financial interest would have changed the outcome of trial. The trier of fact was already aware that K.K. had retained an attorney and that a potential legal action had been discussed between K.K. and her attorney. The court concluded that evidence of K.K.'s settlement negotiations and filing of an EEOC charge did no more than "merely impeach the former evidence of [K.K.'s] trial testimony" and did not "undermine[] the reliability of the key witness to the point that the outcome of the trial would likely have been changed."

{¶41} As for Young's "irregularity in the proceedings" arguments under Crim.R. 33(A)(1), the court found that Young's right to cross-examine K.K. on her financial interest for potential bias and motive to misrepresent was not hindered by any concealment or other intentional wrongdoing. There was no evidence K.K. actively concealed any information and counsel had the opportunity to explore K.K.'s financial interest on cross-examination but chose to limit their questions on the topic. Finally, with respect to Young's claim of "surprise which ordinary prudence could not have guarded against" under Crim.R. 33(A)(3), the court found Young's arguments to be without merit as he failed to demonstrate that the "additional information relevant to [K.K.'s] potential financial interest and bias could not have been discovered by an extended or different line of questioning on cross-examination."

{¶42} Young appealed from the trial court's decision denying his motions for new trial and from his convictions, raising four assignments of error for review.

## II. ANALYSIS

### A. Evidence Excluded at Trial

{¶43} Assignment of Error of Error No. 1:

{¶44} THE TRIAL COURT ERRED BY EXCLUDING ADMISSIBLE EVIDENCE.

{¶45} In his first assignment of error, Young argues the trial court erred in excluding from evidence K.K.'s statement to the Hamilton detectives that Young never rubbed her vagina or touched her breasts and any touching that did occur was asexual. Young contends that this evidence "was admissible as impeachment during Young's cross-examination of the detectives under [Evidence] Rule 613(B)." Young also contends that the trial court erred in excluding three pieces of evidence that would have shown K.K.'s motive to misrepresent. Specifically, Young contends the court should have permitted him to introduce evidence that (1) more than ten years ago, K.K. engaged in an extramarital affair that contributed to a divorce, thereby giving her motive to misrepresent the instant offenses to preserve her current marriage; (2) K.K. knew Young and his wife and K.K. and her husband had sexual partners in common, thereby supplying her with a motive to misrepresent due to jealousy or anger; and (3) K.K. had engaged in flirtatious conduct with her coworkers, which included sharing nude pictures of her body at work. In response, the state argues that Young failed to preserve these evidentiary issues by either failing to raise the issue of the evidence's admissibility at trial or by failing to timely proffer the evidence.

### 1. K.K.'s Prior Statement to Hamilton Detectives

{¶46} At trial, K.K. testified that Young rubbed her vagina with his forearm with a back-and-forth and side-to-side motion and touched her breast when he pulled her down into his lap. Defense counsel confronted K.K. with the inconsistency between her trial testimony and the November 22, 2016 statement she made to the Hamilton detectives, wherein K.K. had denied that Young ever touched her breasts or vagina and stated that

Young "never touched [her] inappropriately sexually." K.K. was permitted to listen to a portion of the recorded interview to refresh her recollection of her statement to Detectives Richardson and Nichols, but the recorded interview was not admitted into evidence. When questioned about the inconsistency between her recorded statement and her trial testimony, K.K. admitted the inconsistencies and offered an explanation for the different statements. K.K. testified that she did not believe the Hamilton detectives' questions during the November 22, 2016 interview related to the incidents she had reported, but rather were related to whether or not there had been other incidents. Specifically, the following exchange occurred:

> [Lead Defense Counsel]: Do you recall giving a statement to Detective Richardson and Detective Nichols on November 22nd where you were specifically asked if [Young] ever touched your breast and your answer was no.
>
> [K.K.]: I do.
>
> [Lead Defense Counsel]: Do you ever recall, on November 22nd, being asked by Detective Richardson and Detective Nichols whether or not [Young] had ever touched your genitalia, as you put it, or vagina, I believe as they put it, do you remember being asked that question?
>
> [K.K.]: I do.
>
> [Lead Defense Counsel]: Do you remember your answer?
>
> [K.K.]: I do.
>
> [Lead Defense Counsel]: What was it?
>
> [K.K.]: No.
>
> [Lead Defense Counsel]: But that changed?
>
> [K.K.] It didn't change. It was – I took them as an asking me that as if – in the exception of these three incidents that you had just described to us, were there any other or were there times he actually done this outside of these things.
>
> [Lead Defense Counsel]: So you thought they weren't talking

- 21 -

about the three incidents that you were there to report on, they were talking about other incidents?

[K.K.] We had already went over those three incidents. I thought they were moving on to further questioning about any other potential incidents.

[Lead Defense Counsel]: Okay. So if we listen to that very interview and it says now you haven't mentioned anything about [Young] ever having touched your breast and I want to make sure that we have this right, did he ever touch your breast and your answer was no because you thought they meant ever, meaning ever other than the three incidents that they were there to question you about? That was your interpretation?

[K.K.]: Correct.

* * *

[Lead Defense Counsel]: Okay. Because the questions that HPD [Hamilton Police Department] asked you weren't specific?

[K.K.]: That interview in and of itself was – I couldn't even tell you exactly how all of it went because I was a mess.

[Lead Defense Counsel]: Okay. Well, if you heard that segment – you know it was audio recorded, right?

[K.K.]: Yes.

[Lead Defense Counsel]: If you heard that would that –

[K.K.]: Sure. I mean, I don't believe Detective Nichols ever asked me what his hands were doing or exactly where they were placed.

[Lead Defense Counsel]: But you do recall he asked if [Young] ever touched your breast?

[K.K.]: At the very end of the conversation.

[Lead Defense Counsel]: And you recall no –

[K.K.]: Yes.

[Lead Defense Counsel]: -- was your answer?

[K.K.]: Yes.

[Lead Defense Counsel]: And if your vagina was ever touched?

[K.K.]: Yes.

[Lead Defense Counsel]: And do you recall no was your answer?

[K.K.]: Again, the context –

[Lead Defense Counsel]: So they weren't –

[K.K.]: -- to other situations, other than those.

[Lead Defense Counsel]: So those questions weren't specific?

[K.K.]: They – I felt they were specific to potential – other potential times.

{¶47} During the state's case-in-chief, Detective Richardson was cross-examined by defense counsel about his and Nichols' November 22, 2016 interview with K.K. Detective Richardson testified that K.K. was specifically asked by Detective Nichols whether Young had ever touched her breasts or vagina and K.K. responded that Young never did anything physically inappropriate with her.

{¶48} Detective Nichols was called as a defense witness. Defense counsel sought to elicit testimony from Detective Nichols as to the specifics of what K.K. disclosed during her November 22, 2016 interview. Defense counsel was able to elicit testimony from Detective Nichols that though K.K. had stated that Young had reached between her legs and hooked her there, she did not state that Young rubbed her vagina or genitalia in an up-and-down or back-and-forth movement. When defense counsel asked Detective Nichols whether K.K. had stated whether Young reached up and grabbed K.K.'s breast, the prosecutor objected, arguing the evidence was inadmissible under Evid.R. 613. The following discussion then occurred at a sidebar:

> [Prosecutor]: Recognizing that this is a bench trial, I was trying to allow [defense counsel] some leeway but at this point this, again, feels to the State like a violation of 613. Any of the

- 23 -

statements that [K.K.] made to the police she was questioned about and she admitted to making and not making. I don't see what the purpose is of calling in the detective when she's already made it. As the law states, once she's admitted it, it's done for proper impeachment.

THE COURT: [Defense counsel]?

[Lead Defense Counsel]: Well, quite honestly, Your Honor, I don't know that she admitted that she failed to tell the detectives that. I think that she was indicated [sic] that her misunderstanding and qualifying anything that she did say about this interview. Ideally, I would just play the interview and I wouldn't even have the witness testify or just admit and let the Court listen to the interview.

[Prosecutor]: And there's evidence rules about the way this needs to be done.

[Lead Defense Counsel]: Judge, I would offer that it is – that if – I'll proffer that the – it's replete with inconsistences and contradictions, some of which he has admitted. Some of which he has not. I'll proffer that it indicates that with regard to this incident that [Young] hooked [K.K.] and pulled [her] into his lap. That it was a matter of seconds. That there's no discussion of touching the breast. That there is no discussion of having rubbed the genitalia. That's there's [sic] no discussion of having nuzzled or bit or kissed the back of her neck and that she was up in a matter of seconds, having told him stop and that he let me go. On the other incidents, I expect based upon what the taped interview says is that he did not forcefully hold [K.K.] He did not forcibly hold [K.K.] on the occasions the State is alleging an abduction. And she didn't admit that. She contradicted that during her testimony. She wouldn't admit that during her testimony.

* * *

THE COURT: [Detective Nichols] doesn't know how [K.K.'s] testified to what she did or didn't say here in Court or anything else. You were able to talk to her about those. I don't recall any that were left hanging by her in that regard. So if you're trying to get exact words out of her mouth through him, I'm asking how that can occur through the rules of evidence?

* * *

THE COURT: You want to get in with your Detective Nichols, statements from [K.K.]?

- 24 -

[Lead Defense Counsel]:  Yes.

THE COURT:  Okay.  That you believe she denied?  I mean, if we're going back to 613 and impeachment type issues, if there's an admission, there's no need to prove up.  * * *

The court ultimately ruled that defense counsel was not permitted to question Detective Nichols as to what K.K. specifically stated during her interview, but counsel was permitted to question the detective about his interview techniques and the basis for some of the questions that were or were not asked of K.K. during the November 22, 2016 interview.

{¶49}  More than three months after Young's trial concluded, during a January 24, 2018 hearing on Young's motion for leave to file his first motion for new trial, defense counsel sought to proffer K.K.'s November 22, 2016 recorded statement to the Hamilton detectives.  Young filed a proffer memorandum under seal with the court, which included the recording.

{¶50}  The state filed a memorandum in opposition to Young's proffer of K.K.'s recorded interview, contending that the proffer was untimely as it came more than three months after the bench trial and verdict.  The state further contended that the proffer was improper as defense counsel never attempted to introduce K.K.'s recorded statement into evidence at trial.  The state argued that other than using the recorded statement to refresh K.K.'s memory during cross-examination,

[Young] never made further attempt to play or admit any of K.K.'s recorded statement to police.  Therefore, no ruling excluding the recording was ever made.  Thus a post-trial proffer of evidence never offered into evidence in the first place is nothing more than an attempt by counsel, both trial and appellate, to create a record that didn't exist in the first place. [Young] is attempting to proffer evidence that was never excluded, erroneously or otherwise.

{¶51}  The trial court addressed Young's proffer of K.K.'s November 22, 2016 statement to the Hamilton detectives at Young's sentencing hearing.  The court found that

the proffer was not timely made, as it was made months after Young's trial concluded. The court stated, "So I'm going to deny it as a proffer. However, as it is part of what I consider the record already, based upon the fact it was turned over in discovery and specifically enumerated in discovery, it will make its way under seal to the Court of Appeals not as a proffer but as part of the record."

{¶52} Having reviewed the record, we find that defense counsel never moved to introduce or admit the recording of K.K.'s interview with the Hamilton detectives into evidence at trial. As such, the trial court was not given the opportunity to admit or exclude the recording from evidence. We therefore cannot rule upon the admissibility of such evidence on appeal and find it unnecessary to discuss the timeliness of Young's proffer of the recording.

{¶53} The record does reflect, however, that defense counsel attempted to admit statements K.K. made during the November 22, 2016 interview through the testimony of Detective Nichols. When the trial court found the evidence was not admissible under Evid.R. 613(B), defense counsel proffered Detective Nichols' expected testimony about the statements K.K. made during her interview. Young has, therefore, preserved the issue for appeal. *See* Evid.R. 103(A)(2).

{¶54} Like other evidentiary rulings, a trial court's decision to admit or exclude evidence under Evid.R. 613(B), is reviewed for an abuse of discretion. *State v. Mathes*, 12th Dist. Clermont No. CA2012-03-028, 2013-Ohio-1732, ¶ 8. An abuse of discretion implies that the court's decision was unreasonable, arbitrary, or unconscionable, and not merely an error of law or judgment. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 130.

{¶55} Evid.R. 613 addresses impeachment by self-contradiction, that is, the use of a witness's prior inconsistent statements to impeach the witness. Specifically, Evid.R.

613(B) provides:

> Extrinsic evidence of a prior inconsistent statement by a witness is admissible if both of the following apply:
>
> (1)  If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;
>
> (2)  The subject matter of the statement is one of the following:
>
> (a)  A fact that is of consequence to the determination of the action other than the credibility of a witness;
>
> (b)  A fact that may be shown by extrinsic evidence under Evid.R. 608(A), 609, 616(A), or 616(B);
>
> (c)  A fact that may be shown by extrinsic evidence under the common law of impeachment if not in conflict with the Rules of Evidence.

{¶56}  "The rule 'specifically contemplates the admission of extrinsic evidence of a prior statement under the circumstances outlined in Evid.R. 613(B).'" *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, ¶ 121, quoting *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 125.  That is to say that Evid.R. 613(B) "does not limit inconsistent-statement impeachment to cross-examination, but 'specifically contemplates' the use of extrinsic evidence."  *Tench* at ¶ 202, quoting *McKelton* at ¶ 125.  Evidence admitted under Evid.R. 613(B) is for the "purpose of attacking the credibility of the witness."  *State v. Perkins*, 12th Dist. Clinton No. CA2005-01-002, 2005-Ohio-6557, ¶ 16.  The statements impeach "on the theory that the making of two different statements with regard to the same event calls into question the truthfulness of the witness, regardless of the truth or falsity of either of the statements."  *Id.*  Extrinsic evidence of a prior inconsistent statement is not, however, admissible as substantive evidence that the matter asserted in the statement was true.  *Tench* at ¶ 203; *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, ¶ 182-184.

{¶57} "In order to introduce the prior inconsistent statement into evidence, proper foundation must be laid." *Mathes*, 2013-Ohio-1732 at ¶ 10. "A proper foundation is laid where the witness denies making the prior statement." *Id.* "However, if a witness admits to making the prior inconsistent statement then extrinsic evidence is not admissible." *Id.*

{¶58} When K.K. was presented with her former statement to Detective Richardson and Detective Nichols during Young's cross-examination, K.K. admitted that she made an inconsistent statement. K.K. admitted that when questioned by Detectives Nichols and Richardson on November 22, 2016, she denied that Young ever touched her breasts or vagina and she stated that Young "never touched [her] inappropriately sexually." K.K. explained that she had been confused when she answered the detectives' questions, believing that their questions did not relate to the incidents she had reported, but rather were related to whether or not there had been other incidents of touching. As K.K. admitted to making the prior inconsistent statements, extrinsic evidence of the prior inconsistent statement was not admissible under Evid.R. 613(B). The trial court, therefore, did not err in finding that Detective Nichols could not testify about K.K.'s statements during the November 22, 2016 interview. *See, e.g., Mathes* at ¶ 11 (finding that extrinsic evidence of the victim's prior inconsistent statement was properly excluded under Evid.R. 613[B] where the victim admitted to the inconsistency at trial but explained that the inconsistency was caused by her confusion and fear).

{¶59} While Young could not introduce extrinsic evidence of K.K.'s admitted inconsistent statement at trial, Young was permitted to elicit testimony from Detective Nichols and Detective Robinson about the nature of their interview with K.K. By asking the detectives about the specific questions they posed to K.K. and their interview techniques and methods, Young was permitted to challenge K.K.'s explanation that the interview was confusing and the confusion led her to make an inconsistent statement. From defense

counsels' cross-examination of K.K. and Detective Richardson and from counsels' direct of Detective Nichols, Young was able to elicit information about the November 22, 2016 interview which allowed the trier of fact to assess the credibility of K.K.'s claim that she had been "confused" when making the admittedly-inconsistent statements that Young never touched her breasts or vagina and "never touched [her] inappropriately sexually."

{¶60} Further, even if extrinsic evidence of K.K.'s prior inconsistent statement was admissible under Evid.R. 613(B), the trial court's exclusion of Detective Nichols testimony about K.K.'s statement was not prejudicial. Defense counsel was permitted to introduce, without objection, extrinsic evidence of K.K.'s inconsistent statement during defense counsels' cross-examination of Detective Richardson. Specifically, defense counsel was permitted to question Detective Richardson as follows regarding K.K.'s November 22, 2016 interview:

> [Defense Counsel]: [K.K.] said the questions that you and Detective Nichols asked were not like very specific. [K.K.] said something about that on her examination. I don't remember if it was on direct or cross, but she said it at some point today?
>
> [Detective Richardson]: Yes, it was.
>
> [Defense Counsel]: Okay, Now I'll tell you why I'm confused. Didn't Detective Nichols ask her in the interview he, meaning Sergeant Young, has never touched your breast? He asked that specific question, right?
>
> [Detective Richardson]: Yes, he did ask her.
>
> [Defense Counsel]: He asked a specific question that Dustin Young never touched your vagina, right?
>
> [Detective Richardson]: Yes.
>
> [Defense Counsel]: And she specifically said in regards to all this stuff that he never did anything physically inappropriate, sexually with me at all. Wasn't that her statement?
>
> [Detective Richardson]: Yes.

[Defense Counsel]: In fact, she kind of put it in the future tense. She said at the end of this interview, I'm actually worried about what might happen in the future, right?

[Detective Richardson]: Yes.

As extrinsic evidence of K.K.'s prior inconsistent statement had already been introduced through Detective Richardson's testimony, any error in excluding Detective Nichol's testimony about K.K.'s inconsistent statement was harmless.

{¶61} Accordingly, to the extent that Young has argued that the trial court erred by excluding evidence of K.K.'s prior inconsistent statement to the Hamilton detectives, we find no merit to his arguments and overrule his first assignment of error.

## 2. K.K.'s Divorce, Knowledge of Sexual Partners, and Flirtatious Conduct

{¶62} Turning to the issue of whether the trial court erred by excluding evidence that K.K. allegedly engaged in an extramarital affair more than ten years ago, that K.K. was aware that she and her husband allegedly had sexual partners in common with Young and his wife, and that K.K. allegedly engaged in flirtatious behaviors with her coworkers, we find we must first address whether Young preserved the issue by seeking to introduce such evidence at trial or by timely proffering the evidence.

{¶63} The record reflects that prior to trial, the state filed a "Motion in Limine Rape Shield, Character Evidence," seeking to have evidence related to K.K.'s alleged prior extramarital affair, the sexual partners that K.K. and her husband and Young and his wife allegedly had in common, and K.K.'s "flirtatious behaviors" excluded from evidence. The trial court held two in-chambers hearings on the state's motion in limine: one on August 9, 2017 and one on September 13, 2017. The in-camera discussions were not recorded, but the court's rulings were memorialized on the record at the end of each hearing. The court granted the state's motion in limine, finding that such evidence was barred by Ohio's rape

shield law and/or was barred due to "a lack of a link or a nexus."[6]

{¶64} As this court has previously recognized, a trial court's decision to grant a motion in limine is a "'tentative, interlocutory, precautionary ruling by the trial court reflecting its anticipatory treatment of the evidentiary issue[s].'" *State v. Setty*, 12th Dist. Clermont Nos. 2013-06-049 and CA2013-06-050, 2014-Ohio-2340, ¶ 28, quoting *State v. Grubb,* 28 Ohio St.3d 199, 201-202 (1986). As the trial court's ruling was interlocutory, it was incumbent upon Young "to seek the introduction of the evidence by proffer or otherwise [at trial] in order to enable the court to make a final determination as to its admissibility and to preserve any objection on the record for purposes of appeal." *Grubb* at 203. After all, "[t]he initial ruling on the motion in limine did not, in and of itself, preserve the record on appeal." *Setty* at ¶ 29, citing *Grubb* at 203. Rather, "any claimed error regarding a trial court's decision on a motion in limine must be preserved at trial by objection, proffer, or a ruling on the record." *State v. Harris*, 12th Dist. Butler No. CA2007-11-280, 2008-Ohio-4504, ¶ 27. Where a defendant does not seek to introduce the evidence that was the subject of a motion in limine at trial or fails to proffer the contents of that evidence at trial, he has waived his right to object to the evidentiary issues on appeal. *See* Evid.R. 103; *Grubb* at 203; *Setty* at ¶ 30.

{¶65} The record reflects that Young failed to preserve the evidentiary issues that were the subject of the motion in limine at trial. Young's appellate brief does not contain a citation to the trial transcript wherein he sought to elicit testimony, admit evidence, or make a proffer relating to the issues of K.K.'s alleged prior extramarital affair, the sexual partners

---

6. When the trial court went on the record to summarize its holdings from the in-chambers hearings on the state's motion in limine, the court did not summarize the specifics of what the parties had discussed. As a result, on June 4, 2018, three months after Young filed his initial notice of appeal, the trial court issued an "Agreed Statement to the Rape-Shield Proceedings Under App.R. 9(C)" in which the court summarized the in-camera discussions "as they relate[d] to the issues referenced in the Court's rulings made on the record on each date" of the hearings.

he and his wife and K.K. and her husband allegedly had in common, or K.K.'s alleged "flirtatious behaviors" with her co-workers.[7]  Rather than seeking the introduction of evidence by proffer or otherwise at trial so as to allow the trial court to revisit its interlocutory holding regarding the admissibility of the evidence, Young waited until more than three months after the court rendered a guilty verdict to try to proffer the evidence.  At the end of January 2018, Young filed a proffer memorandum under seal with the court, in which he stated that he was seeking to proffer explicit images of K.K. that were allegedly shared with Young and other police officers and evidence demonstrating K.K. had a prior affair that ended her first marriage.  Notably, the proffer memorandum did not mention any evidence relating to the sexual partners Young and his wife and K.K. and her husband allegedly had in common.  The state objected to the proffer, contending it was untimely and an attempt by Young to create a record that did not exist in the first place as Young never sought to introduce such evidence during trial.  The trial court concluded that the proffer was untimely.

{¶66}  We find that by not seeking to introduce evidence that was the subject of the state's motion in limine at trial and by not proffering the evidence during the October 2017 bench trial, the trial court was denied the opportunity to make a final determination as to the admissibility of the evidence.  Young has therefore failed to preserve the issue and has waived his right to object to the evidentiary issues on appeal.  *Grubb*, 28 Ohio St.3d at 203;

---

7. App.R. 16(A)(3) requires that an appellate brief contain "[a] statement of the assignments of error presented for review, *with reference to the place in the record where each error is reflected*." (Emphasis added.)  App.R. 16(A)(7) further provides that the brief must contain "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, *and parts of the record on which appellant relies*." (Emphasis added.) Where an appellant has failed to comply with App.R. 16(A) by omitting citations to that portion of the record where an alleged error has occurred, we have declined to scour the entire record searching for such error. *See State v. Wilson*, 12th Dist. Warren No. CA2018-03-022, 2019-Ohio-338, ¶ 27; *State v. Metcalf*, 12th Dist. Butler No. CA2010-12-326, 2012-Ohio-674, ¶ 35-36.  *See also State v. Wallace*, 1st. Dist. Hamilton No. C-160613, 2017-Ohio-9187, ¶ 54 (where the defendant argued that certain text messages admitted into evidence contained hearsay but failed to identify which text messages were being challenged, the appellate court declined to examine all the text messages to determine if any contained hearsay and were improperly admitted).

*Setty*, 2014-Ohio-2340 at ¶ 30.

{¶67} Accordingly, to the extent that Young argues the trial court erred by excluding evidence relating to K.K.'s alleged prior extramarital affair, the sexual partners he and his wife and K.K. and her husband allegedly had in common, or K.K.'s alleged "flirtatious behaviors" with her coworkers, we overrule his first assignment of error.

## B. Evidence Admitted at Trial

{¶68} Assignment of Error No. 2:

{¶69} THE TRIAL COURT ERRED BY ADMITTING INADMISSIBLE EVIDENCE.

{¶70} In his second assignment of error, Young argues the trial court erred in admitting text messages that were exchanged between Young and K.K. between April 2016 through November 2016 (Exhibit 21). Young contends that these messages, which were recovered from K.K.'s phone by law enforcement, were inadmissible pursuant to Evid.R. 1003 as the texts that were "incomplete" and "fail[ed] to show accurate meaning." The state, however, contends Young failed to preserve his arguments under Evid.R. 1003 as he did not raise an objection to the admission of the text messages under this evidentiary rule at trial.

{¶71} As this court has previously recognized, "[w]hen properly objected to, this court reviews a trial court's decision to admit or exclude evidence under an abuse of discretion standard." *State v. Ruth*, 12th Dist. Fayette No. CA2019-08-018, 2020-Ohio-4506, ¶ 11. When a defendant fails to object, or fails to object at trial on the specific ground raised on appeal, the reviewing court is limited to a plain-error analysis. *State v. Tibbetts*, 92 Ohio St.3d 146, 160-161 (2001), citing Evid.R. 103(A)(1) and *State v. Mason*, 82, Ohio St.3d 144, 159 (1998); *State v. Blake*, 12th Dist. Butler No. CA2011-07-130, 2012-Ohio-3124, ¶ 25. An alleged error is plain error only if it is "obvious" and "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Jackson*, 12th Dist.

Fayette No. CA2011-01-001, 2011-Ohio-5593, ¶ 13, citing *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, ¶ 181.

{¶72} At trial, evidence was introduced that both K.K. and Young had deleted from their respective cell phones the various text messages they sent to one another. Young had also purchased a new cell phone. Detective Schneider, a digital forensic examiner, was able to extract deleted data containing some of the text messages from K.K.'s cellphone. Young objected to the admission of the text messages under Evid.R. 106 and Evid.R. 403, contending that the messages were inadmissible as they constituted only a partial record of K.K.'s and Young's communications and admission of the messages was unfairly prejudicial since the full context of the messages was unknown. Young's counsel further objected to admission of the text messages on the basis that the messages were not authenticated, stating, "Your Honor, I would also indicate that just along with and I think it's a similar argument that without the complete exchanges of these texts that they can't properly be authenticated either." Young's objections were overruled and the text messages were admitted into evidence.

{¶73} We find that Young's general objection to the "authenticity" of the text messages was not sufficient to preserve an objection under Evid.R. 1003. As such, our review is limited to a plain-error analysis.

{¶74} Evid.R. 1003 provides that "[a] duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Evid.R. 1003. A duplicate includes "a counterpart produced * * * by means of photography, including enlargements and miniatures, or by mechanical or electronic re-recording, or by chemical reproduction, or by other equivalent techniques which accurately reproduce the original." Evid.R. 1001(4).

{¶75} "The party seeking to exclude a duplicate has the burden of demonstrating that the duplicate should be excluded." *Tibbetts*, 92 Ohio St.3d at 160. "The party seeking to exclude a duplicate cannot rely on mere speculation as to its authenticity." *State v. Barton*, 12th Dist. Warren No. CA2005-03-036, 2007-Ohio-1099, ¶ 79, citing *State v. Easter*, 75 Ohio App.3d 22, 27 (4th Dist.1991). "[T]he decision to admit duplicates, in lieu of originals, is one that is left to the sound discretion of the trial court." *Easter* at 27. Additionally, with respect to the authenticity of a document, this court has previously recognized that "[t]he threshold requirement for authenticity of evidence is low and does not require *conclusive* proof of authenticity. * * * Instead, the state only needs to demonstrate 'a reasonable likelihood' that the evidence is authentic." (Emphasis sic.) *Blake*, 2012-Ohio-3124 at ¶ 28, quoting *State v. Thomas*, 12th Dist. Warren No. CA2010-10-099, 2012-Ohio-2430, ¶ 15.

{¶76} Detective Schneider acknowledged that not all of the deleted material on K.K.'s phone could be recovered as "[s]ome things [were] overwritten" by new data after being deleted. Nonetheless, the detective testified that using a Cellebrite program, he was able to conduct an advanced logical extraction of deleted data from K.K.'s cellphone. The text messages that were able to be downloaded from the phone were set forth in Exhibit 21, and those messages that were sent to K.K. from Young or sent from K.K. to Young were identified by Detective Schneider and by K.K. When questioned about Exhibit 21, K.K. identified the messages that she received from Young and stated she "recognized those conversations." Detective Schneider's and K.K.'s testimony was sufficient to authenticate the records.

{¶77} Further, admission of the text messages was proper. In *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, a defendant challenged the admission of his confession to law enforcement, as the detectives who obtained the confession only recorded part of

the interrogation. *Id.* at ¶ 108. The defendant argued it was fundamentally unfair for the recorded confession to be admitted into evidence when a portion of the interview was unavailable. *Id.* at ¶ 109. The supreme court found no error in the admission of the partial recording, noting that "where a conversation was partly recorded and partly unrecorded, the trial court [was not required to] exclude the recorded portion." *Id.* at ¶ 112.

{¶78} Evid.R. 106, known as "the rule of completeness," should be considered in determining when a partial writing or recorded statement can be introduced. This rule provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which is otherwise admissible and which ought in fairness to be considered contemporaneously with it." Evid.R. 106. This rule contemplates "the fundamental fairness of presenting statements in context rather than in isolation." *State v. Davis*, 4 Ohio App.3d 199, 201 (9th Dist.1982), citing McCormick, *Evidence*, Section 56 (2d Ed.Cleary Ed.1972). Here, the full context of the text messages – to the extent that the messages were able to be recovered – were made available in the admission of Exhibit 21. Young's conduct in deleting the messages he and K.K. exchanged undermine any argument he has advanced concerning the unfairness in not admitting the full context of the text messages. Had Young not deleted the text messages, the messages would have been preserved and available for use at trial.

{¶79} For the reasons stated above, we find no error, plain or otherwise, in the trial court's admission of Exhibit 21. The text messages were relevant and admissible. *See Blake* at ¶ 24-35; *State v. Norris*, 2d Dist. Clark No. 2015-CA-22, 2016-Ohio-5729, ¶ 27-44. Young's second assignment of error is therefore overruled.

### C. Cumulative Error

{¶80} Assignment of Error No. 3.

{¶81} THE TRIAL COURT'S CUMULATIVE ERRORS DENIED YOUNG DUE PROCESS AND A FAIR TRIAL.

{¶82} In his third assignment of error, Young argues that a number of errors occurred at trial and in the proceedings leading up to trial which, when combined, denied him of his rights to due process and a fair trial. Specifically, Young contends he was prejudiced by the following errors: (1) the trial court's exclusion of admissible impeachment evidence that K.K. told the Hamilton detectives there was no sexual touching or restraint for touching; (2) the trial court's exclusion of admissible bias evidence that explained K.K.'s prior inconsistent statements; (3) the trial court's erroneous admission and reliance on incomplete texts to infer Young's sexual gratification; (4) the trial court's erroneous stacking of multiple inferences from the incomplete texts to infer Young's sexual gratification during the gross sexual imposition event; and (5) the trial court's error in failing to record the motion in limine and rape-shield hearings under Crim.R. 22.

{¶83} Pursuant to the cumulative error doctrine, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64 (1995); *State v. McClurkin*, 12th Dist. Butler No. CA2007-03-071, 2010-Ohio-1938, ¶ 105. In order for the cumulative error doctrine to apply, "an appellate court must first find that multiple errors, none of which individually rose to the level of prejudicial error, actually occurred in the trial court." *State v. Cramer*, 12th Dist. Butler No. CA2003-03-078, 2004-Ohio-1712, ¶ 67, citing *State v. DeMarco*, 31 Ohio St.3d 191, 197 (1987).

{¶84} The first three errors Young has identified relate to matters discussed in this court's resolution of Young's first and second assignments of error. For the reasons set forth above, we find no error with respect to the court's evidentiary rulings as it related to

the admission of the text messages, the exclusion of extrinsic evidence regarding K.K.'s prior statement to the Hamilton detectives, or the exclusion of evidence relating to K.K.'s alleged prior extramarital affair, the sexual partners Young and his wife and K.K. and her husband allegedly had in common, or K.K.'s alleged flirtatious behaviors with her co-workers.

{¶85} As for Young's claim that the trial court erred by stacking multiple inferences from the incomplete texts recovered from K.K.'s cell phone to infer Young's sexual gratification during the gross sexual imposition event, this court has already addressed this issue and found it to be without merit. As we explained in Young's prior appeal,

> with respect to the text messages Young exchanged with K.K., we find that consideration of the text messages did not result in impermissible inference stacking. Impermissible inferencing stacking occurs when a trier of fact "draw[s] an inference based entirely upon another inference, unsupported by any additional fact or another inference from other facts." *State v. Braden*, 12th Dist. Preble No. CA2013-12-012, 2014-Ohio-3385, ¶ 12. Here, the trier of fact could look at the text messages presented by the state to determine the nature of Young's and K.K.'s relationship and to infer Young's touching was for purposes of sexual arousal or gratification without stacking inferences on top of each other. In the text messages, Young called K.K. "baby," commented on her sexiness and physical attributes, and indicated his desire to push her over his desk and "[get] a really good feel." Using these messages, the trier of fact could infer that at the time Young rubbed K.K.'s vagina with his forearm and touched her breast with his hand, he was motivated by desires of sexual arousal or gratification.

*State v. Young*, 2019-Ohio-912 at ¶ 49.

{¶86} Finally, with respect to Young's claim that the trial court erred by failing to record the motion in limine and rape-shield hearings under Crim.R. 22, we note that Young's arguments relate to the August 9, 2017 and September 13, 2017 hearings the court conducted on the state's "Motion in Limine Rape Shield, Character Evidence." These hearings were held in the court's chambers and were not recorded. However, at the

conclusion of each hearing, the court went on the record to memorialize the parties' discussions and its rulings.

{¶87} Crim.R. 22 requires that "[i]n serious offense cases all proceedings shall be recorded." A "serious offense" includes any felony offense. Crim.R. 2(C). While all proceedings in felony cases should be recorded, the Ohio Supreme court has held that

> reversal of convictions and sentences on grounds of some unrecorded bench and chambers conferences, off-the-record discussions, or other unrecorded proceedings will not occur in situations where the defendant has failed to demonstrate that (1) a request was made at trial that the conferences be recorded or that objections were made to the failures to record, (2) an effort was made on appeal to comply with App.R. 9 and to reconstruct what occurred or to establish its importance, and (3) material prejudice resulted from the failure to record the proceedings at issue.

*State v. Palmer*, 80 Ohio St.3d 543, 554 (1997), *cert. denied*, 525 U.S. 837, 119 S.Ct. 96 (1998). *See also State v. Nields*, 93 Ohio St.3d 6, 27 (2001).

{¶88} Young has failed to meet the requirements of *Palmer*. While Young supplemented the record on appeal with an App.R. 9(C) statement in which the trial court summarized the in-camera discussions related to the motion in limine and rape shield hearings, neither the App.R. 9(C) summary nor the recorded portions of the August 9, 2017 and September 13, 2017 hearings indicate Young objected to the hearings not being recorded in full. Additionally, Young has made no showing of prejudice. Between the trial court's on-the-record summation of the in-chambers portion of the hearing, the court's on-the-record rulings regarding the state's motion in limine, and the App.R. 9(C) statement, this court was presented with an adequate record for purposes of conducting appellate review. *See State v. Parrish*, 12th Dist. Butler No. CA2000-10-199, 2002-Ohio-5447, ¶46-51; *State v. Davis*, 12th Dist. Butler No. CA98-06-134, 2000 Ohio App. LEXIS 3534, *4-8 (Aug. 7, 2000).

{¶89} Accordingly, having found no error in the trial court's evidentiary rulings, the court's consideration of the text messages in determining Young's guilt, or prejudicial error in the court's failure to record the August 9, 2017 and September 13, 2017 hearings on the state's motion in limine regarding character evidence and rape-shield matters, we conclude that Young was not deprived of a fair trial and that the cumulative error doctrine is inapplicable. Young's third assignment of error is overruled.

### D. Motions for New Trial

{¶90} Assignment of Error No. 4:

{¶91} THE TRIAL COURT ERRED BY OVERRULING THE MOTIONS FOR A NEW TRIAL.

{¶92} In his fourth assignment of error, Young argues the trial court erred by denying his first and second motions for new trial. Young contends that evidence of K.K.'s financial interest in the outcome of trial and evidence of the Snapchat photograph were previously undisclosed or unknown pieces of evidence which materially affected his substantial right to a fair trial.

{¶93} "The decision to grant or deny a motion for a new trial under Crim.R. 33 rests within the sound discretion of the trial court." *State v. Blankenship,* 102 Ohio App.3d 534, 556 (12th Dist.1995), citing *State v. Schiebel*, 55 Ohio St.3d 71, 76 (1990). Similarly, the decision to grant or deny an evidentiary hearing on a motion for new trial rests within the trial court's broad discretion. *State v. Workman*, 12th Dist. Butler No. CA2000-03-049, 2000 Ohio App LEXIS 3865, *9 (Aug. 28, 2000), citing *State v. Smith*, 30 Ohio App.3d 138, 139 (9th Dist.1986).

{¶94} As pertinent to this assignment of error, Crim.R. 33(A) provides that

> [a] new trial may be granted on motion of the defendant for any
> of the following causes affecting materially his substantial rights:

(1) Irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial;

(2) Misconduct of the jury, prosecuting attorney, or the witnesses for the state;

* * *

(6) When new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as is reasonable under all the circumstances of the case. The prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses.

### 1. K.K.'s Undisclosed Financial Interest

{¶95} As set forth above, Young contends he did not learn that K.K. had a financial interest in the outcome of trial until early August 2019, when the public university that employed K.K. responded to his fifth public-records request. At this time, Young learned that K.K. had made a demand for compensation from the university on August 27, 2017, more than five months before trial commenced, and that after settlement negotiations between the university and K.K. fell through, K.K. filed an EEOC claim to preserve her right to file a Title IV lawsuit on August 9, 2017 – two months before trial commenced. K.K. eventually settled with the university in May 2018, receiving an agreed-to sum of money and reassignment to a new position at the university.

{¶96} Young contends that given K.K.'s undisclosed financial interest, the trial court erred by denying his second motion for new trial under the grounds set forth in Crim.R.

33(A)(1), (2), and (6).[8]  Relying on *State v. Ferguson*, 5 Ohio St.3d 160 (1983) and *State v. Vanek*, 11th Dist. Lake No. 2002-L-130, 2003-Ohio-6957, Young maintains that a new trial should be ordered as K.K.'s undisclosed financial interest prejudiced his right to challenge K.K.'s motive and potential bias – issues that affected K.K.'s credibility and the overall result of trial given the lack of physical evidence or corroborating evidence of gross sexual imposition and abduction.[9]

{¶97}  In *Ferguson*, the trial court prohibited the defendant from cross-examining the victim about her retention of a lawyer to file a civil suit against the defendant's former employer.  *Ferguson* at 165.  The Ohio Supreme Court considered the issue and found that

> [i]t is beyond question that a witness' bias and prejudice by virtue of pecuniary interest in the outcome of the proceeding is a matter affecting credibility under Evid. R. 611(B).  [The defendant] contends that the victim's contemplated civil action against [the defendant's] former employer, stemming from the victim's alleged rape, was a permissible subject of cross-examination since the victim stood to benefit financially from [the defendant's] conviction.  We agree that [the defendant] should have been permitted to elicit testimony regarding the civil action contemplated by the prosecuting witness.  * * *
>
> * * *
>
> Consequently, we hold that [the] accused is permitted to cross-examining the prosecuting witness as to the witness' pending or contemplated civil action against the accused, in order to demonstrate any possible bias or prejudice arising out of the witness' financial interest in the outcome of the prosecution.

*Id.* at 165-167.

---

8. In his second motion for new trial, Young claimed he was entitled to a new trial pursuant to Crim.R. 33(A)(3), for an "[a]ccident or surprise which ordinary prudence could not have guarded against."  The trial court found no merit to Young's claim, and Young has not asserted in his appellate brief an error relating to the court's denial of his motion as it pertains to Crim.R. 33(A)(3).  As such, we limit our analysis to Young's claims under Crim.R. 33(A)(1), (2), and (6).

9. Young also cites *State v. Gertz*, 186 Ariz. 38, 918 P.2d 1056 (1995), in support of his claim that a new trial should be ordered due to K.K.'s undisclosed financial interests.  *Gertz,* a decision arising out of an Arizona appellate court, has no precedential value and is factually distinguishable from the present case.  As such, we are not persuaded to follow *Gertz*.

{¶98} In *Vanek*, the defendant was charged with sexual imposition and unlawful restraint. *Vanek*, 2003-Ohio-6957 at ¶ 2. The victim of the offenses was an employee who worked at a deli owned by the defendant. *Id.* at ¶ 6. The victim brought a civil suit for damages, alleging claims of sexual harassment, discrimination in the workplace, retaliation, hostile/abusive workplace, and severe emotional distress. *Id.* at ¶ 3. The trial court expressly ruled at a pretrial hearing and during cross-examination of the victim and another trial witness that evidence of the victim's civil suit was inadmissible. *Id.* at ¶ 31. The defendant moved for a new trial, but the motion was denied by the trial court. *Id.* at ¶ 13. On appeal, the Eleventh District reversed, finding that in accordance with *Ferguson*,

> extrinsic evidence, namely [the victim's] civil complaint, may be used for impeachment purposes. Based on Evid.R. 611(B), a witness' bias and prejudice by virtue of a pecuniary interest in the outcome of the proceeding is a matter affecting credibility. The case against [the defendant] was predicated to a great degree upon [the victim's] testimony, therefore making [the victim's] credibility crucial. * * * As such, the trial court's exclusion of the evidence of [the victim's] civil complaint against [the defendant] is plain error which requires reversal and a new trial based on Crim.R. 33.

*Id.* at ¶ 31.

{¶99} The present case is distinguishable from *Ferguson* and *Vanek* in that in Young's case, the trial court did not prohibit defense counsel from inquiring into K.K.'s financial interest and possible motive to lie. Young was permitted to question K.K. about the issue, and defense counsel did question K.K. about her financial interest to some extent before voluntarily discontinuing that line of questioning. Specifically, defense counsel questioned K.K. as follows regarding her financial interest in the outcome of the proceedings:

> [Lead Defense Counsel]: Do you intend to sue [the public] [u]niversity about this?
>
> [K.K.]: No.

[Lead Defense Counsel]: Have you consulted with an attorney about that?

[K.K.]: About suing?

[Lead Defense Counsel]: Yeah.

[K.K.]: Over?

[Lead Defense Counsel]: Over this incident.

[K.K.]: No – well, I have an attorney, yes, but there's no lawsuit.

[Lead Defense Counsel]: As of yet?

[K.K.]: There's not going to be.

[Lead Defense Counsel]: Okay. Have you even discussed with other officers that if you got a felony conviction against Dustin Young if you'd be able to go after his pension?

[K.K.]: Not me discussing that. Didn't know anything about it until it was brought to my attention after the charges were filed.

[Lead Defense Counsel]: Who brought that to your attention?

[K.K.] I believe [an officer] * * * told me.

[Lead Defense Counsel]: So the officers that are the ones that you reported to, are the ones that were telling you that?

[K.K.]: Yes.

Beyond this discussion, defense counsel did not question K.K. about any financial interest she may have possessed in the outcome of the trial.

### a. *Irregularity In the Proceeding – Crim.R. 33(A)(1)*

{¶100} Young asserts that he was entitled to detailed information relating to K.K.'s claim against the university as evidence favorable to him under Crim.R. 16(B)(5) and that the state's failure to disclose this information prior to trial, as well as the prosecutor's statement during closing arguments that K.K. had no pecuniary interest in the criminal proceedings, were "irregularities in the proceeding" entitling him to a new trial under Crim.R.

33(A)(1).  Young contends evidence of K.K.'s pecuniary interest provides K.K.'s motive for changing her trial testimony from that of her statement to the Hamilton detectives and that such evidence would have affected the outcome of trial as the state's case was entirely dependent upon K.K.'s credibility.

{¶101} Crim.R. 16(B)(5) provides that the prosecutor, upon written demand, provide copies of "[a]ny evidence favorable to the defendant and material to guilt or punishment." "Prosecutorial violations of Crim.R. 16 are reversible only when there is a showing that (1) the prosecution's failure to disclose was a willful violation of the rule, (2) foreknowledge of the information would have benefited the accused in the preparation of his defense, and (3) the accused suffered some prejudicial effect."  *State v. Joseph*, 73 Ohio St.3d 450, 458 (1995).

{¶102} Defense counsel has not established that the prosecutor willfully failed to disclose evidence of K.K.'s demand for compensation from the university, the parties' settlement negotiations, or K.K.'s filing of the EEOC claim.  No evidence was offered indicating the state had knowledge of the specifics of K.K.'s actions as it pertained to her demand for compensation from the university.  To the extent that the state had any knowledge of K.K.'s actions regarding the university, the state's September 12, 2017 Fourth Supplemental Discovery Response advised defense counsel that it had "been informed that, as of mid-August, there was a pending complaint by K.K. with * * * [the] University with some relation to the indicted events.  The status of the complaint is unknown."

{¶103} "Ohio law generally recognizes that the state need not gather evidence on the defendant's behalf."  *State v. Fornshell*, 1st Dist. Hamilton No. C-180267, 2021-Ohio-674, ¶ 10, citing *Kettering v. Baker*, 42 Ohio St.2d 351, 354-355 (1975).  While the Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that a state disclose material evidence favorable to the defendant and prohibits the state from failing to

preserve such evidence or destroying such evidence in bad faith; *see Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963); *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333 (1988); the state has no duty to gather exculpatory evidence. *State Brown*, 3d Dist. Hancock No. 5-17-19, 2018-Ohio-899, ¶ 32; *State v. Farris*, 2d Dist. Clark No. 2003 CA 77, 2004-Ohio-5980, ¶ 20. The state does not have an obligation "to engage in affirmative action in gathering evidence which an accused might feel necessary to his defense. The accused must protect his own interests." *Baker* at 354. With that in mind, "when the state has failed to gather exculpatory evidence or to fully investigate the allegations, the defendant may either investigate the charge and collect the evidence himself, if such evidence is available, or he may point out the deficiencies in the state's investigation at trial." *Farris* at ¶ 20.

{¶104} In the present case, the state put Young on notice about the "pending complaint by K.K." with the university. At that point, it was incumbent upon defense counsel to take steps to investigate K.K.'s claim against the university. Defense counsel did not do so. There is no indication in the record that defense counsel subpoenaed records or university personnel to obtain information about K.K.'s complaint with the university or her potential financial interest in the outcome of the criminal proceedings. In fact, the record reveals that defense counsel waited until December 22, 2017, well after Young's trial concluded, before seeking any records from the university regarding K.K.'s financial interest. Accordingly, as the state did not fail to comply with Crim.R. 16(B)(5) or fail to disclose *Brady* evidence, the alleged failure cannot serve as the basis for an "irregularity in the proceedings" as contemplated by Crim.R. 33(A)(1).

{¶105} Young also argues the prosecutor's statement during closing arguments that K.K. lacked a financial interest in the criminal proceedings was an "irregularity in the proceedings" necessitating a new trial as the statement was incorrect and misleading and

prejudiced the outcome of trial. In support of his argument, Young relies on *State v. Staten*, 14 Ohio App.3d 78 (2d Dist.1984).

{¶106} In *Staten*, the Second District Court of Appeals found that the defendant was entitled to a new trial based upon prosecutorial misconduct in a robbery case. *Id.* at 81-83. The prosecutor in *Staten* knowingly permitted an inaccurate inference to persist that a state's witness was given certain funds from the defendant and that these funds were money stolen during a robbery. The prosecutor further advanced that inference during opening and closing arguments. *Id.* at 81-82. The Second District found that the prosecutor had a duty to clear up the misunderstanding as the prosecutor "was privy to knowledge that the testimony [of the witness] was both incorrect and misleading." *Id.* at 82. Furthermore, the prosecutor should not have used the misleading testimony in his closing statements. *Id.* at 82-83. As the prosecutor's misconduct was so egregious that it affected the defendant's fundamental right to a fair trial, the Second District found that a new trial was warranted. *Id.* at 84-85.

{¶107} Young's reliance on *Staten* is misplaced. Young has not asserted a claim of prosecutorial misconduct or argued that K.K. had shared with the prosecutor the details of her claim against the university. In fact, Young's appellate counsel's affidavit states that communications with the prosecutor indicated the state was unaware that K.K. was actively seeking compensation from the university in the months leading up to and during trial. As the prosecutor did not have knowledge of K.K.'s demand for compensation from the university, any settlement negotiations, or K.K.'s filing of the EEOC claim, the prosecutor cannot be said to have misled the jury when stating during closing arguments that K.K. did not have a financial interest to "make this all up" so that she could sue the university. Accordingly, the trial court did not err in finding that Young was not entitled to a new trial based on an irregularity in the proceedings.

b. *Newly Discovered Evidence – Crim.R. 33(A)(6)*

{¶108} Young asserts that the documents obtained from the public university in response to his fifth public-records request constitute newly discovered evidence entitling him to a new trial. To prevail on a Crim.R. 33(A)(6) motion for new trial on the ground of newly discovered evidence, the movant must demonstrate that the new evidence "(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." *State v. Petro*, 148 Ohio St. 505 (1947), syllabus. *See also State v. Buell*, 12th Dist. Warren No. CA2017-07-102, 2018-Ohio-1350, ¶ 9 (applying the *Petro* analysis).

{¶109} Young urges this court not to engage in a *Petro* analysis, but rather to apply a "less stringent" test as the newly discovered evidence allegedly introduces an "untried issue." Citing *State v. King*, 63 Ohio App.3d 183 (6th Dist.1989), Young argues that to be entitled to a new trial under Crim.R. 33(A)(6) he need only show that (1) the new evidence represents a material issue that would likely change the trial outcome or (2) undermines the reliability of a key witness that would likely change the trial outcome.

{¶110} In *King*, the defendant was convicted of aggravated murder with a death penalty specification. *Id.* at 187. The defendant was referred to a clinical psychologist, Dr. Briskin, in preparation for the mitigation phase of trial. *Id.* Dr. Briskin expressed the opinion that the defendant met the criteria for not guilty by reason of insanity defense as he was suffering from a mental defect or disease at the time the murder was committed. *Id.* The defendant moved to amend his plea of not guilty to include a plea of not guilty by reason of insanity and moved for a new trial on the basis of Dr. Briskin's opinion, which constituted newly discovered evidence. *Id.* Upon the request of the state, the defendant was

subsequently examined by Dr. Cassel, a forensic psychologist, and by Dr. Sherman, a psychiatrist and medical director. *Id.* at 190. After evaluation, both doctors testified as to the defendant's mental condition at the time of the offenses and opined that the defendant did not meet the criteria necessary for an insanity defense. *Id.* The trial court applied the *Petro* factors in considering the defendant's motion for new trial and found that all factors were satisfied except that the newly discovered evidence embodied in Dr. Briskin's report did not disclose a strong probability that it would change the guilty verdict if a new trial was granted. *Id.* at 190-191. The trial court stated that the newly discovered evidence "standing alone or weighed against the testimony of Drs. Cassel and Sherman discloses no possibility that the testimony, of [sic] offered, would have changed the result." *Id.* at 191.

{¶111} The Sixth District Court of Appeals reversed, observing that

[t]he [trial] court had clearly weighed the testimony of Drs. Cassell and Sherman against that of Dr. Briskin and all of the other evidence and determined that the defense of not guilty by reason of insanity would not succeed at a new trial.

While such application of the standard and weighing of evidence is certainly appropriate where the newly discovered evidence would tend to prove or disprove matters of fact as to existing issues, that is not necessarily the case where the newly discovered evidence supports, rather, the existence of entirely new issues not previously litigated.

* * *

[As the other *Petro* factors were met,] the only remaining question was whether or not there was a strong probability that the result would be different if a new trial was granted.

Upon consideration of the entire record herein, this court finds that on the particular facts of this case * * * it was not reasonable for the trial court to assume that it could determine to what degree of probability a new trial, to a jury with an entirely new trial strategy based on an insanity defense, would conclude with the same result.

*King* at 193.

{¶112} Accordingly, contrary to Young's assertions, *King* does not stand for the proposition that the *Petro* analysis does not apply when newly discovered evidence relates to an untried issue. *King* recognizes that the *Petro* analysis applies, but finds that with respect to one factor – whether the new evidence discloses a strong probability that it will change the result if a new trial is granted – a trial court may not resolve the issue by weighing the newly discovered evidence against other evidence when the newly discovered evidence raises an issue not previously litigated.

{¶113} We find that the trial court appropriately applied the *Petro* analysis and that the court did not abuse its discretion in concluding that Young was not entitled to a new trial under Crim.R. 33(A)(6). Unlike in *King*, the trial court was not considering an unlitigated issue and weighing entirely new evidence. Rather, the state had disclosed in pretrial discovery that K.K. had filed a complaint with the university that related to the events for which Young had been indicted. Young was aware of K.K.'s potential financial interest in the outcome of the trial based on K.K.'s testimony on cross-examination that she had consulted with an attorney with regard to the public university. Young had knowledge of K.K.'s potential financial interest and could have pursued a more in-depth cross-examination of K.K. concerning her claim against the university. Defense counsel could have questioned K.K. about the complaint she filed with the university, asked generally, without violating attorney-client privilege, if K.K. was aware of any settlement discussions between her attorney and the university, or asked if a formal complaint had been filed with the EEOC. Counsel elected not to pursue this line of questioning, perhaps for strategic reasons as counsel wished to avoid eliciting testimony about the university's internal investigation into Young's actions in the workplace.

{¶114} In any event, it is clear that the "newly discovered evidence" of K.K.'s financial interest in the outcome of trial was new only in degree, but not in subject matter. The

specific details that Young learned of after trial – K.K.'s demand for compensation from the university, settlement negotiations, and K.K.'s filing of the EEOC complaint, were all events that a more in-depth cross-examination of K.K. or the pretrial subpoenaing of university personnel or records could have disclosed. As the trier of fact was already aware that K.K. had retained an attorney and that a potential legal action had been discussed between K.K. and her attorney, there was not a strong probability that further information regarding K.K.'s financial interest would have changed the outcome of trial. Accordingly, we find that the trial court did not abuse its discretion in denying Young's motion for new trial on the basis of Crim.R. 33(A)(6).

c. *Misconduct of a Witness – Crim.R. 33(A)(2)*

{¶115} Finally, Young claims that K.K.'s failure to disclose her complaint with the university, her settlement negotiations with the university, and the filling of the EEOC claim constituted misconduct by a witness under Crim.R. 33(A)(2). Young asserts K.K. should have disclosed these matters prior to trial or, at the very least, while being cross-examined at trial. He further contends that K.K.'s failure to disclose these matters and her failure to correct the prosecutor's statement during closing arguments that K.K. did not have a financial interest in the outcome of the proceedings constituted reversible error. Finally, Young asserts that the trial court should have conducted a hearing to determine whether K.K. lied about her pecuniary interest at trial, as the affidavits submitted in support of the motion for new trial and the documents received as part of the public-records request "raised enough doubts about K.K.'s honesty to require a credibility evaluation" following consideration of the factors identified by the supreme court in *State v. Calhoun*, 88 Ohio St.3d 279, 284-285 (1999).

{¶116} In *Calhoun,* the supreme court, in examining affidavits filed in support of a petition for postconviction relief, noted that "not all affidavits accompanying a postconviction

relief petition demonstrate entitlement to an evidentiary hearing." *Id.* at 284. The court found that a trial court, "in accessing the credibility of affidavit testimony in so-called paper hearings should consider all relevant factors," including (1) whether the judge reviewing the postconviction petition also presided at trial, (2) whether multiple affidavits contain nearly identical language, or otherwise appear to have been drafted by the same person, (3) whether the affidavits contain or rely on hearsay, (4) whether the affiants are relatives of the petitioner, or otherwise interest in the success of the petitioner's efforts, and (5) whether the affidavits contradict evidence proffered by the defense at trial. *Id.* at 285. "Moreover, a trial court may find sworn testimony in an affidavit to be contradicted by evidence in the record by the same witness, or to be internally inconsistent, thereby weakening the credibility of that testimony." *Id.* Though the present case does not involve a petition for postconviction relief, the *Calhoun* factors have been applied in the context of a motion for new trial. *See State v. Gaines*, 1st Dist. Hamilton No. C-090097, 2010-Ohio-895, ¶ 26 ("applying the *Calhoun* factors to assess the credibility of affidavits submitted in support of, and thus to determine the need for an evidentiary hearing on," a Crim.R. 33 motion for new trial); *State v. Watson*, 12th Dist. Butler No. CA2016-08-159, 2017-Ohio-1403 (applying the *Calhoun* factors to a combined motion for leave for new trial and petition for postconviction relief).

{¶117} Having reviewed the record, we find that the trial court did not abuse its discretion in denying Young's motion for a new trial under Crim.R. 33(A)(2) without holding an evidentiary hearing. Though the trial court did not specifically cite to *Calhoun* in its written decision, it is apparent from the court's decision that the trial court examined the affidavits of Young's lead trial attorney, as well as the documents obtained from the university as part of Young's public-records request and compared the information set forth in those documents to the evidence introduced at trial. As the trial court noted, the affidavits

and documents introduced by Young in support of his motion for new trial did not contradict trial testimony or demonstrate that K.K. lied or misled anyone when answering defense counsels' questions about her financial interest in the case. K.K. indicated that though she had retained counsel, she had not filed a lawsuit against the university over the incident and "there's not going to be [one]." Nothing submitted by Young demonstrated this testimony was false. Rather, K.K. answered the questions asked of her truthfully. As the trial court noted, the victim's testimony that there was not going to be a lawsuit "may have been her understanding based on conversations with her attorneys" or it "may have accurately reflected a lack of desire on her part to take the matter as far as a formal lawsuit."

{¶118} Additionally, K.K. is not subject to the discovery provisions of Crim.R. 16 and, as a result, did not have a duty to contact defense counsel to inform them of her or her private attorney's actions with respect to the university. Crim.R. 16 refers to the obligations of the prosecuting attorney and defense counsel and places no obligations upon victims and witnesses. Additionally, Young has not presented any evidence, by way of affidavit or otherwise, indicating K.K. actively concealed the information relating to her claim against the university. K.K. simply did not volunteer the information. To the extent K.K. was cross-examined at trial regarding her intent to sue the university, K.K.'s testimony was objectively truthful.

{¶119} Finally, contrary to Young's claims, K.K. was not obligated to object to the prosecutor's closing statement. As the trial court noted, there was no evidence that K.K. was present in the courtroom during closing arguments. Furthermore, "it is not reasonable to envision a scenario in which an attorney is giving a closing argument and a witness corrects that attorney."

{¶120} Accordingly, for the reasons expressed above we find that the trial court did not abuse its discretion in denying Young's motion for new trial under Crim.R. 33(A)(2)

without holding an evidentiary hearing. Young has failed to demonstrate he was entitled to a new trial under Crim.R. 33(A)(1), (2), or (6) for K.K.'s alleged failure to disclose her financial interest in the outcome of trial. We therefore overrule Young's fourth assignment of error as it relates to the trial court's denial of his second motion for new trial.

## 2. Snapchat Photograph – Ineffective Assistance

{¶121} Young also asserts that the trial court erred in denying his first motion for new trial under Crim.R. 33(A)(1) as his trial counsel provided ineffective representation in failing to discover and discuss with him the topless Snapchat photograph of K.K. that the state provided during discovery. He further argues trial counsel provided ineffective representation by failing to use the Snapchat photograph at trial to provide insight into the nature of his relationship with K.K., to impeach K.K.'s testimony that any touching that occurred between the two was nonconsensual, and to bolster his defenses that the touching was consensual or did not occur. As we previously recognized, "[i]neffective assistance of trial counsel may be raised as a ground for a new trial under Crim.R. 33(A)(1) 'irregularity in the proceedings.'" *Young*, 2019-Ohio-912 at ¶ 33, quoting *State v. Farley*, 10th Dist. Franklin No. 03AP-555, 2004-Ohio-1781, ¶ 11. *See also State v. Williams*, 11th Dist. Trumbull No. 2013-T-0096, 2014-Ohio-4883, ¶ 24.

{¶122} "In order to prevail on an ineffective-assistance-of-counsel claim, a defendant must prove that counsel's performance was deficient and that the defendant was prejudiced by counsel's deficient performance." *State v. Davis*, 159 Ohio St.3d 31, 2020-Ohio-309, ¶ 10, citing *State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989) and *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). "Thus, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Id.*, citing *Bradley* at paragraphs two and three of the syllabus.

"'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Bradley* at 142, quoting *Strickland* at 694. The failure to satisfy either the deficiency prong or the prejudice prong of the test is fatal to a claim of ineffective assistance of counsel. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000).

{¶123} The Snapchat photograph was recovered from K.K.'s phone during Detective Schneider's data extraction and was disclosed to the defense as "counsel only" material during discovery. As the photograph was turned over as "counsel only" material, Young was prevented from viewing the photograph and defense counsel was limited to "orally communicat[ing]" the material to the defendant. Crim.R. 16(C). Here, Young's three trial attorneys all attested that because they had not discovered the photograph prior to trial, the photograph was not communicated or discussed when consulting with Young about defense theories or ways to impeach K.K.'s testimony. Trial counsels' failure to discover the Snapchat photograph in the discovery materials constitutes deficient performance.

{¶124} Nonetheless, we find that the trial court did not abuse its discretion in denying Young's first motion for new trial as Young failed to demonstrate he was prejudiced by trial counsels' deficiency in overlooking the Snapchat photograph. Young has not shown a reasonable probability of a change in the outcome of trial had defense counsel discovered and used the Snapchat photograph at trial or in preparing for trial.

{¶125} As the trial court noted, significant portions of Young's affidavit filed in support of his first motion for new trial were self-serving and contradicted by evidence introduced at trial. As this court has previously recognized, "it is well-established that a trial court may weigh the credibility of affidavits submitted in support of a motion for new trial to determine whether to accept the statements in the affidavit as true." *State v. Knecht*, 12th Dist. Warren No. CA2015-04-037, 2015-Ohio-4316, ¶ 35. "When ruling upon a motion for new trial, a trial court has discretion to discount self-serving affidavits executed by a defendant or his

or her relatives." *State v. Wood*, 12th Dist. Preble No. CA2005-11-018, 2006-Ohio-3781, ¶ 38.

{¶126} In his affidavit, Young claims that K.K. voluntarily showed him "numerous naked photographs of her body during the course of [their] employment and personal relationship" and that she did so by means of "Snapchat, text message, and by handing [him] her phone." These statements are self-serving and are contradicted by testimony and video evidence introduced at trial. At trial, K.K. acknowledged that "there were sexual content messages" exchanged between herself and Young. However, K.K. denied that Young had ever seen her naked. Further, in his recorded interview with the Hamilton detectives, Young was specifically asked about the type of messages he and K.K. exchanged, and Young stated they exchanged "flirty messages" via Snapchat and text messaging. According to Young, these flirty messages included K.K. sending him pictures of herself in her underwear and showing him photographs of herself in a bra after undergoing a breast augmentation. Young never claimed that he received or viewed nude photographs of K.K. during his interview with the Hamilton detectives – despite having every opportunity to do so. As Young's affidavit is self-serving and contradicted by evidence in the record, the trial court was entitled to discount Young's claims that K.K. showed him numerous naked photographs of herself.

{¶127} The trial court was also entitled to discount Young's claim that he was not certain whether K.K. sent him the Snapchat photograph in question as the photograph was "counsel only" material and he was unable to determine from his counsels' description whether he had received the photograph. Given the nature of the photograph, Young's claim is incredulous. As the trial court noted,

> the Court can't imagine [counsel's] description [of the Snapchat photograph] was very generic. "Have you ever seen a picture of K.K.'s [bare] breasts with a text box that says, 'More room to

bend me over here.?'" Frankly, the Court can't envision a way of describing the photograph in which the Defendant SHOULDN'T be able to determine the answer. Even if the victim's identity is taken out of the equation, and Defendant was asked if he has ever seen a picture of ANYONE'S breasts with a text box that says "More room to bend me over here," the Court can't imagine Defendant has seen so many such pictures that he would be unable to determine if he had seen the specific one in Exhibit 3."

{¶128} Young asked the trial court to speculate that the Snapchat photograph was either sent to Young or was meant for Young and was a continuation of his and K.K.'s text conversation from November 5, 2016. During the November 5, 2016 text conversation, Young sent a message stating, "I thought about pushing you over my desk and getting a really good feel." In response, K.K. stated, "Now that's a bit much." Young then promised to "try not to cross the line to much," to which K.K. responded, "Again, uh huh."

{¶129} There is no evidence in the record that the photograph was ever sent or was intended for Young. Though the metadata date of the photograph was November 8, 2016, no evidence was submitted demonstrating that the photograph was sent to Young or anyone else on that date. The metadata date of the photograph could have been the date the photograph was saved to K.K.'s phone through Snapchat, though taken on an earlier day, week, month, or year. Additionally, there is no indication that the photograph, which was produced through the Snapchat social media application, was a continuation of the conversation Young and K.K. had three days prior, by means of a different communication method (i.e., text messaging).

{¶130} Young contends that had counsel discovered the photograph prior to trial, he would have pursued a different defense strategy or had counsel use the photograph to impeach K.K. on cross-examination. However, Young's assertion is flawed in that if K.K. had been sending him nude photographs, Young surely would have advised defense counsel of such and this information could have been used in forming a defense strategy

and in cross-examining K.K. at trial. Counsel did not ask K.K. at trial about any nude photographs that may have been sent. Instead, counsel questioned K.K. about the nature of her relationship with Young by asking K.K. about her interactions and behaviors with Young.

{¶131} The record reveals that defense counsel was able to impeach K.K. and call into question the credibility of her testimony through cross-examination of K.K. and Young's fellow officers and through the presentation of testimony from Sergeant Rosenberger. In addition to eliciting testimony that K.K. and Young exchanged inappropriate text messages that contained sexual content, defense counsel was able to introduce evidence that K.K. willingly accepted back massages from Young at work, accepted a hockey shirt as a personal gift from Young, continued to text with Young after some of the conduct Young was indicted for had occurred, chose to stand next to Young for the duration of a three-hour long hockey game, traveled alone with Young to a fast-food restaurant, and tried to make Young jealous by closing herself in an office with Sergeant Rosenberger.

{¶132} Furthermore, during closing arguments, defense counsel highlighted concerns about K.K.'s credibility and set forth Young's consent and innocence defenses, arguing K.K.'s conduct was not consistent with someone who had been forcibly restrained or compelled into sexual contact by force. Lead defense counsel stated, in relevant part, the following:

> [K.K.] also said that there was a point in time in May [2016] when [Young] became angry at her, wouldn't talk to her, wouldn't say anything to her. She intervened to – "[W]hat's wrong? What's wrong?" Why not right with the period of time when she's going to the captain to say, "[Y]ou know, what's the problem, I've heard he's going to lose his stripes?" She's intervening on [Young's] behalf.
>
> It doesn't make any sense if his text and behavior is starting down this road of trouble, it doesn't make any sense. She's intervening for quite the opposite purpose, she wants the

contact. I thought it was interesting that she says, that you know, "He would make these other officers leave the station so he could have me all to himself." That was what she said.

And then, I'm looking at the text the Prosecutor has provided from August 1st. "Are you still alive out there?" from [K.K.] to [Young]. "I was in the bathroom, headed there now. Is everyone else at the station still?" The response, "No one's here."

Wait a minute, "No one's here?" If this is the guy that's coming after you, * * * that's now after you sexually, and you are afraid for your well-being, why are you providing him with the very information, "No one's here, no one's here."

Perhaps the State may say, well, that's early, this timeframe that we've given you, August to November, so that's early in the game. Maybe all this stuff happened at some point after that. Well, then we can go to the text from October 24th, the one that references [K.K.'s] ass.

We're not here on inappropriate text messaging charges. We're not here for telecommunications' harassment. It's not the trial today. It was a text, again out of context, but what we do know is that five days later, on October 29th, that [K.K.] attended a hockey game.

We know at that point, based upon her testimony, that she said that the most egregious incident, the worst one she says, the time that he grabbed me, and hooked me, and holds me onto his lap, and rubs his arm on my genitalia and grabs my breasts; that's on the 24th, is when this text comes.

So we know that's after it, but then she goes to this hockey game, with her assailant. And stays next to him for three hours. Oh well, Officer [Dave] Young didn't think it would be good for me to stand by his [p]ost, because it was down by the glass. Okay. There's multiple officers there. Granted, the hockey team hasn't been as good as it's been in the past, but there's probably more than a dozen people there.

Who did she go and stand next to? Where does she choose to perch herself? Right next to Dustin Young. And then what happens when they leave the hockey game; they're back at the station. And under cross-examination, granted after we went around, and around a bit, you made plans to go out to dinner. "No, no, that's [not] true. We didn't make plans to go out to dinner."

"Well, you left with him, didn't you?" "Well, I just got a drink."
Nobody went to Wendy's. So she's leaving with him, to go to
Wendy's, just to get a drink, because she didn't want anything
to eat. It' doesn't make any sense for her to be engaged in that,
with this person that she says has done these horrible things to
her.

{¶133} Given these circumstances, where Young had already attacked K.K.'s credibility and presented a consent defense in addition to an innocence defense, we find that the trial court did not abuse it's discretion in denying Young's first motion for new trial. Even if we assume it was sent or intended for Young, the Snapchat photograph did not establish K.K. consented to the conduct forming the basis for the gross sexual imposition or abduction charges or otherwise negate the force or threat of force elements found by the trier of fact. The existence of the Snapchat photograph does not undermine confidence in the outcome of trial.

{¶134} Accordingly, we find that the trial court did not abuse its discretion in denying Young's first motion for new trial as Young has failed to show he was prejudiced by defense counsel's failure to discover the Snapchat photograph prior to trial. Young's claim of an irregularity in the proceedings entitling him to a new trial under Crim.R. 33(A)(1) fails. Young's fourth assignment of error is, therefore, overruled.

### III. CONCLUSION

{¶135} Having found Young's assignments of error to be without merit, we hereby affirm Young's convictions and the denial of his motions for new trial.

{¶136} Judgment affirmed.

M. POWELL, P.J., and BYRNE, J., concur.